WILLIAM BOEHM, JR., ET UX. *v.* WILLIAM BOEHM, SR., ET UX.

[No. 19, October Term, 1943.]

*Decided November 4, 1943.*

The cause was argued before SLOAN, C. J., DELA-PLAINE, COLLINS, MARBURY, GRASON, MELVIN, ADAMS, and BAILEY, JJ.

*Hyman Ginsberg,* with whom were *Ginsberg & Ginsberg* on the brief, for the appellants.

*Emanuel Klawans* and *Marvin I. Anderson* for the appellee.

BAILEY, J., delivered the opinion of the Court.

William Boehm, Sr., and Agnes Boehm, his wife, were the owners, as tenants by the entitreties, of an undivided one-half interest in a farm in Anne Arundel County, the other undivided one-half interest in which was owned by their son, William Boehm, Jr., and his wife, Josephine Boehm, as tenants by the entireties. The prop-property was conveyed to them, subject to a mortgage of $3,200, by deed dated October 2, 1920. The total purchase price was $5,400, and the balance of $2,200 was paid by the father and wife and by the son and wife in equal shares.

On December 3, 1942, the father and his wife filea an amended bill of complaint in the Circuit- Court for Anne Arundel County against their son and his wife, alleging that in 1925 the defendants entered into an oral agreement with the plaintiffs to sell their interest in said farm for the sum of $1,100 in cash and the assumption by the plaintiffs of the whole of the mortgage thereon; that at that time the plaintiffs paid to the defendants $570 on account of said purchase price; that since then the plaintiffs have paid all taxes on said farm and all interest on said mortgage; and that, quoting from said bill of complaint:

"In reliance upon said contract the plaintiffs have given up other employment and have resided upon said farm and have worked and improved the same and have erected thereon entirely at their own expense a dwelling, tobacco barn, double garage, chicken coops, stable, and have purchased about $1,000 of farm machinery of no use to them except in connection with said land, and have raised crops on said farm, and have devoted their entire- time and effort to said land and have improved and benefited same in many ways not readily susceptible to being valued in money. From the time of said agreement to sell to the plaintiffs, the defendants have paid

no portion of the taxes on said land, or interest on said mortgage, and have not expended any money whatsoever account of said land, and have not raised any crops thereon. About 1933 the defendants purchased a separate farm for themselves, and at that time they requested and received payment from the plaintiffs of the balance of said $1,100 purchase money with interest thereon from the time of said oral agreement of sale to this time of payment in full.

"That the defendant Josefin Boehm had full knowledge of the aforesaid agreement to sell the defendants' interest in said farm to the plaintiffs and she acquiesced and consented and agreed thereto and received and accepted the benefits of the purchase money paid by the plaintiff; and both defendants had full knowledge of the plaintiffs' possession of said farm and of the improvements and expenditures being made by the plaintiffs and the work being done by them and of the belief on the part of the plaintiffs in making said improvements and performing said work that the plaintiffs owned said land to the exclusion of any right of the defendants, and the defendants in no manner apprised the plaintiffs of any claim of rights in said land asserted by the defendants.

"That the defendants never claimed or asserted any rights in said farm from the time of said agreement of said sale by them to the plaintiffs until recently, when the defendants prevented the plaintiffs from selling timber on said farm by telling the buyer that they owned an interest therein; and they now assert rights in said farm. That the plaintiffs desire to refinance said mortgage and for this reason desire a conveyance from the defendants to the plaintiffs and the defendants refuse to execute such conveyance."

The prayers of the bill were that the defendants be declared to hold their legal title to said land in trust for the plaintiffs, that the defendants be required to convey all their rights in said land to the plaintiffs or that a trustee be appointed for this purpose, and for further relief.

The defendants filed a combined demurrer and answer to the amended bill of complaint. The grounds for the demurrer are: (1) That the bill does not state facts entitling the plaintiffs to the relief prayed for therein or to any relief in equity against the defendants, (2) that the plaintiffs have a full, complete and adequate remedy at law, (3) that they have been guilty of laches, and (4) that the Statute of Frauds is a complete defense to the bill. By their answer they denied all the material averments of the bill and alleged that they were still the owners of an undivided one-half interest in said farm. At the same time, the defendants filed a cross-bill against the plaintiffs, praying for an accounting for machinery and equipment on the farm and for the profits from said farm.

Testimony was taken before the chancellor and thereafter, on March 3, 1943, his decree was filed overruling the demurrer to the bill of complaint, dismissing the dedendants' cross-bill for an accounting and subjecting the undivided one-half interest of the defendants in the farm to a lien in favor of the plaintiffs for $1,500. The decree further provided for the sale of the defendants' interest unless the said sum with interest was paid within thirty days, and that the debt and lien might be satisfied and extinguished by a conveyance of the defendants' interest to the plaintiffs within the said period of thirty days. From this decree the defendants have appealed.

The following facts are undisputed: All the parties moved to the farm soon after its purchase and continued to live thereon for about two years. During most of this period the father and son worked in Baltimore, no effort was made to engage in any extensive farming operations, and there was little, if any, income from the farm. The taxes thereon and the interest on the mortgage were paid by the plaintiffs and defendants in equal shares. After the expiration of two years, the defendants returned to Baltimore. The father and mother continued to live on the farm for a while, but in 1923 the father

went back to Baltimore, worked there and boarded with a daughter. The mother remained on the farm for a further period, but she finally returned to Baltimore and for several years the farm was vacant. The defendants ceased paying their share of the taxes and interest after they left the farm in 1922, and in October, 1924, they purchased a home on Loretta Avenue in Baltimore. The father was a carpenter and the son a machinist. In 1927 and 1928 the father and son drove from Baltimore to the farm on Sundays and holidays and built a tobacco barn, chicken house and garage thereon. Most, if not all, of the necessary lumber was sawed from trees cut on the farm, but the sawing was paid for by the father, as were the galvanized roofing and other necessary materials. In 1929 the father moved back to the farm, paid all the expenses in connection with a crop of tobacco and received the proceeds from the sale thereof. In 1930 the dwelling house was destroyed by fire and the sum of $2,000, collected from the insurance, was paid to the mortgagee, thereby reducing the mortgage to $1,200. Shortly after the fire the father and son agreed to work the farm on shares, each to receive one-half, and the son and his wife rented their Loretta Avenue home and moved, with their children, to the farm. The two families lived together in the outbuildings and the father and son proceeded to grow tobacco and other crops and to rebuild the dwelling. A part of the lumber used in rebuilding was sawed from trees cut on the farm, a part of the proceeds of the tobacco crop and money of the father was used in purchasing materials for the new house and, in addition, $1,200 was raised for this purpose by increasing the mortgage from $1,200 to $2,400. The new mortgage was executed by all the parties. The joint operation of the farm was discontinued in 1933, when it was suggested by the mother that the farm was not large enough to support two families and that the son's family should return to Baltimore so that he could resume his work

as a machinist. The defendants then left the farm, but instead of going to Baltimore, they purchased and moved to another farm near the farm in controversy. The purchase price of this farm was $1,500, of which $400 was paid in cash and the balance secured by mortgage. The title to this property, as well as to the dwelling on Loretta Avenue in Baltimore, was taken by the defendants as tenants by the entireties.

Thereafter the defendants never participated in the operation of, or shared in the profits from, or paid any of the expenses on, or asserted any acts of ownership over, the farm first purchased where the father and mother continued to live, until the summer of 1942, when the plaintiffs sold some timber, and then the two sons of the defendants went on the farm and notified the purchaser of this timber that their parents, the defendants, owned a one-half interest in said farm and would not permit the removal of said timber. Shortly thereafter, on October 14, 1942, this suit was instituted.

We come now to the facts in dispute. The father testified that after the defendants had purchased the Loretta Avenue property, the son wanted to get his money out of the jointly owned farm and that the plaintiffs agreed orally to buy the interest of the defendants therein for $1,100, which was the amount that they had contributed to the purchase price. While the conversation was with the son, he testified that the son's wife was present and knew about the agreement. The father then withdrew $500 from the Calvert Bank, the mother contributed $70 and $570 was given to the son, in the presence of his wife. The father further testified that the balance of $530, with interest from the date of the oral agreement, or a total of $830, was paid to the son in 1933, while all of the parties were living together on the farm, that it was with this money that the son made the cash payment of $400 on the other farm purchased by him at that time, and that his daughter-in-law was in the next room and knew the details of the transaction.

The father's testimony is supported by the testimony of his two daughters, a grandson and two neighbors. One daughter, Mrs. Anna Tapman, testified that she talked with both defendants in 1925 or 1926, that they said they did not want to go back to the farm, that they might as well get their money out of it and pay it on their house, and that they both acknowledged the sale of their interest in the farm to the plaintiffs. According to Mrs. Tapman, her sister-in-law told her that they, the defendants, had received $570 on account of the purchase price, and her brother told her, in 1942, in the presence of her son, that they, the defendnts, had been paid out for their interest in the farm, but that he wanted $1,200 for his work.

Another daughter, Mrs. Elsie Seippel, testified that sometime after 1933 "when I was talking to my brother he said the first payment he got when he lived·on Loretta Avenue, and he had his second payment when he lived on the farm in a very small house, and she said she guessed she will have to live there quite a while as my father had paid them off and there was not any more money coming to them."

Mrs. Tapman's son, in an affidavit, admitted by agreement, stated that in July, 1942, during a conversation between his mother, his uncle, William Boehm, Jr., one of the defendants, and himself they were told by the said defendant that he had been paid for any and all interest he had in the farm in question.

Emil Gertz, a neighbor, testified as to two conversations with William Boehm, Jr. In the first conversation, the defendant said "he did not know anything about making tobacco bed and wanted to find out as he was expecting to buy a farm and his father was to pay him out his share he had in the place." In the subsequent conversation, after the defendant had purchased his farm, the defendant said "he had $800.00 left in the place, he got his share out of it, he was not interested because not making money on it, could not make living on it for two families, so he decided to go for himself." Arthur

Thompson, another neighbor, corroborated Gertz as to the first conversation.

Both of the defendants testified and their testimony is directly in conflict with the testimony of the father. They both deny that there was ever any agreement to sell their interest in the farm to the plaintiffs, saying that the matter was never discussed by the parties. The son denied that he received the payment of $570 on account of the purchase price as testified by the father, but admitted that in 1924 he received $500 from his father, claiming that $250 thereof was for his share of the sale price of certain cross-ties cut from the farm and sold about 1922 and that the other $250 was for his one-half interest in an automobile, purchased jointly by him and his father in 1920, at about the time the farm was purchased. The son denied receiving from the father in 1933 the sum of $830, which the father claimed was paid as the balance of the purchase price, with interest from the date of the oral contract, but admitted receiving from his parents at that time $500, saying at first that his father gave it to him, then that his mother made the gift and finally that they loaned him the money. And at the same time he was contending that his parents were indebted to him for his labor in assisting in erecting the improvements on the farm.

It is interesting to note that while Mrs. Boehm, Jr., denied ever making any agreement to sell her interest in the farm and stated that the matter was never discussed in her presence, she admitted taking part in the conversation relating to the defendants' moving off the farm and testified as follows: "I said, if they paid me out what I put in the farm and my money that I put on the mortgage I would sign off." This conversation took place before the plaintiffs made the final payment to the defendants and shortly thereafter the defendants did move from the farm.

The first question for our determination is whether or not there was an agreement for the sale of the de-

fendants' interest in the farm to the plaintiffs for the sum of $1,100, as alleged by the plaintiffs. This question is a factual one and as much of the testimony is in direct conflict its determination turns upon the weight to be given the testimony of the several witnesses and the inferences to be drawn therefrom. All the testimony must be considered in connection with the relative situation and resources of the parties and with the purposes which they were seeking to accomplish during the entire period from 1920 to 1942. Certainly the conduct of the defendants during this period is consistent with the claim of the plaintiffs that there was an agreement of sale. During the time that none of the parties lived on the farm the taxes and interest were paid by the plaintiffs, with no contribution or offer of contribution from the defendants. And when the defendants returned to the farm, during the period of economic distress, the relationship between the parties is not inconsistent with the plaintiffs' claim of ownership of the entire farm. At that time no offer was made by the defendants to reimburse the plaintiffs for the payments made by them for taxes, interest and materials for the barn, garage and chicken house. The agreement then was simply for the tilling of the farm by the father and son, with each to receive one-half of the profits.

We are not impressed by the son's explanation of the payment of $500 in 1924, for his interest in the crossties and the automobile. His testimony with respect to the automobile is not at all convincing. The automobile was purchased jointly in 1920 for $500, was used by both the father and son to go back and forth from the farm to Baltimore and was sold by the father for $42. It is unreasonable to believe that in 1924, after it had been used for more than four years, the father would buy the son's interest for the same price at which the automobile was originally purchased. We have already commented on the evasiveness of the son's testimony respecting the payment of $500 in 1933. From a con-

sideration of all the testimony in the record we have reached the conclusion that the plaintiffs did purchase the defendants' interest in the farm and have paid for it in full, and that the daughter-in-law did know of the agreement of sale and the details thereof and acquiesced therein. We feel that the testimony as a whole, in spite of her express denial, shows that her husband, in dealing with their interest in the farm and in agreeing to sell the same to the plaintiffs, was acting with her consent, either express or implied, and that she is now estopped from setting up the defense that she was not a party to the alleged agreement. She received, and is now holding on to, the fruits of the transaction, and she will not now be allowed to repudiate the same. The present case is to be distinguished from the cases of *Abrams v. Eckenrode,* 136 Md. 244, 110 A. 468; *Milburn v. Michel,* 137 Md. 415, 112 A. 581, and *Weininger v. Weininger,* 140 Md. 227, 117 A. 568, relied upon by the defendants. In those cases the court found as a matter of fact that the wife was not a party to the contract sought to be enforced, and that in dealing with the property the husband was acting without either her express or implied consent. In this case we find, as a matter of fact, that she was actually a party to the contract of sale and stands, therefore, in the same position as her husband in respect thereto.

The contract was entirely in parol, and is unenforceable because not in writing as required by the fourth section of the Statute of Frauds, unless there is some act of part performance sufficient to remove the bar of the statute. The only acts of part performance proved in this case are the payment of the purchase price and the continuation of the plaintiffs in possession of the farm. But the payment by the purchaser to the vendor of a part, or even the whole, of the purchase money is not an act of part performance which will of itself take the parol contract out of the statute. *Miller's Equity Procedure,* Sec. 709; *Hopkins v. Roberts,* 54 Md. 312; *Gor-*

*such v. Kollock,* 139 Md. 462, 115 A. 779. When possession is assumed as an act of part performance it must appear that the land has been delivered and the possession taken in pursuance of the contract and so retained and continued. The possession must be referable to the contract. Mere occupancy, not shown to be in pursuance of the contract, does not constitute part performance. *Miller's Equity Procedure,* Sec. 707; *Semmes v. Worthington,* 38 Md. 298.

In the last mentioned case, at page 326, the court says that "the partial and subordinate possession that was held by the plaintiff, under the peculiar circumstances of the case, was, to make the most of it, an equivocal act, susceptible of a variety of interpretations, and affording no evidence or presumption whatever of the particular contract alleged, and to allow such act, even if the contract were otherwise established, to remove the bar of the statute would operate a virtual repeal of it as applied to cases like the present, and let in all the mischief that was intended to be guarded against by the statute. The principle upon this subject is well established. The act relied on as part performance must, in itself furnish evidence of the identity of the contract; and it is not enough that it is evidence of some agreement, but it must relate to and be unequivocal evidence of the particular agreement charged in the bill."

The general rule as stated in 58 *Corpus Juris,* p. 1009, is that, where the parties to an oral contract for the conveyance of land were tenants thereof in common, the mere continuance in possession by the vendee after the withdrawal of the vendor from possession is not sufficient to remove the bar of the statute. We do not feel that the possession of the plaintiffs in the case is so referable to the contract as to constitute an act of part performance, coupled even with the payment of the full purchase price, which would justify a decree for specific performance. Nor do we think that the evidence in the record relating to the improvements erected on the

property and paid for by the plaintiffs is evidence of acts so unequivocally referring to and resulting from the agreement of purchase as to bring the case within the rule laid down by this court in the case of *Schluderberg v. Deitz,* 156 Md. 547, 144 A. 774, and to take the case out of the Statute of Frauds.

But the plaintiffs are not without remedy. The principle which the courts recognize as the foundation of relief in this class of cases was stated in *Bowie v. Stonestreet,* 6 Md. 418, 61 Am. Dec. 318, quoting from 1 *White & Tudor's Leading Cases in Equity,* 527, as follows: "When the specific execution of a parol agreement cannot be decreed, in consequence of the uncertainty in the terms, or of the statute being relied on, the court will, if there is no remedy at law, or it is uncertain or embarrassed, or under circumstances of special equity, decree compensation to the extent of the purchase money paid, and the value of lasting improvements."

The principle was recognized and applied by this court in *Green v. Drummond,* 31 Md. 71, at page 83, 1 Am. Rep. 14, where the court said:

"A specific execution of the alleged agreement being denied, the question is, whether the bill should be retained for the purpose of awarding compensation for the purchase money paid and advanced by him?

"It has been said to be a general rule of equity that 'no one shall avail himself of a law made for his protection, so as to injure another, and especially, not to enrich himself at his expense.' [*Anthony v. Leftwich's Representatives*] 3 Rand. [Va. 238] 258.

" 'The Statute of Frauds was intended to protect parties against feigned or incomplete agreements. But when one party induces another, on the faith of a parol contract, to place himself in a worse situation than he would have been if no agreement had existed, and especially if the former derives a benefit therefrom, at the expense of the latter, and avails himself of his legal advantage, he is guilty of a fraud, and uses the Statute

for a purpose not intended, the injury of another, for his own profit. The fraud does not consist in availing himself of the Statute to protect himself, but in using it to appropriate to himself what justly belongs to another.' [*Anthony v. Leftwich's Representatives*] 3 Rand [Va.] 259.

"To prevent such injustice, Courts of Equity, in cases where the party is not entitled to specific performance, often grant relief by decreeing just compensation; that is, by decreeing the repayment of the money expended on the faith of the contract. Many cases might be cited in which such relief has been granted.

"Some conflict has arisen upon the question as to the particular circumstances under which a Court of Equity will entertain jurisdiction and grant relief, by awarding compensation to a party who fails to maintain his bill for specific performance. 'Such relief,' as stated by Judge Story (2 Eq., Sec. 794), 'is ordinarily to be decreed in equity only as incidental to other relief sought by the bill and granted by the Court, or where there is no adequate remedy at law, or where some peculiar equity intervenes.'

"In this case it seems to us doubtful whether the appellant could, by any proceeding at law, recover the money paid and advanced by him under the contract; for there he would be met by the provisions of the Statute, which would preclude him from giving evidence of such parol contract.

"The money not being advanced as a loan to be repaid, but expended in pursuance of the agreement for the joint purchase of land, in order to maintain an action at law to recover back the money, it would be necessary to prove the contract under which it was paid, which he would be precluded from proving by parol, by reason of the provisions of the Statute, and thus his remedy at law might fail and justice be denied. [*Anthony v. Leftwich's Representatives*] 3 Rand [Va.] 259, 260.; *White v. Coombs*, 27 Md. 489.

"In such case, according to the authorities a Court of Equity ought to give relief, because there is no remedy at law, or a very inadequate and pecarious one."

We find the same principle applied in the cases of *Cross v. Iler*, 103 Md. 592, 64 A. 33; *Wiley v. Wiley*, 115 Md. 646, 81 A. 180, Ann. Cas. 1913A, 789; *Ahrens v. Ijams*, 156 Md. 1, 142 A. 489; and *Ahrens v. Ijams*, 158 Md. 412, 148 A. 816. In our opinion the principles applied in the cases above cited apply with equal force to this case.

The plaintiffs are entitled not only to a decree for compensation but also to a lien on the defendants' interest in the farm. The rule is stated in 3 *Tiffany on Real Property*, 2nd Ed., Sec. 667, as follows:

"The vendee under a contract for the sale of land has, in equity, before he recieves a conveyance of the land, a lien thereon for any payments which he has made upon the purchase price in case the contract fails of consummation owing to the fault of the vendor."

See also *Chamberlain v. Preston*, 170 Md. 1, 182 A. 579.

While the bill does not pray for a decree for compensation to the extent of the purchase money paid and a lien on the land therefor, it does contain the prayer for general relief, and as stated by this court in *Hill v. Pinder*, 150 Md. 397, at page 414, 133 A. 134, at page 140, "Under the prayer for general relief the court is not confined to what may be specially asked, but may adapt the relief to the nature of the case as stated in the bill; and, if the specific relief prayed for cannot be granted, the plaintiff may be given any relief which is consistent with, and warranted by, the allegations of the bill. *Miller's Equity*, Sec. 100." The allegations of the amended bill of complaint in this case, which are quoted herein, are of such a character as to meet the requirements of the above rule and to sustain the decree for compensation and lien.

As to the amount of the lien, we see no reason to alter the findings of the chancellor. He allowed the amount of the purchase price, $1,100, without interest, together with the additional sum of $400, which represents one-half of the difference between the amount of the mortgage at the time of the oral agreement and the amount due thereon at the date of the decree, the mortgage having been reduced from $3,200 to $2,400, without any additional allowance to the plaintiffs for the enhancement in value of the property due to the permanent improvements placed thereon subsequent to the agreement. The plaintiffs have not appealed from the decree and the amount of $1,500 represents the very minimum that is owed by the defendants under the evidence in the case.

The defendants have urged that the plaintiffs have a full, complete and adequate remedy at law, but this argument is without force in view of the authorities cited in *Green v. Drummond, supra.*

The only other defense relied upon by the defendants is that of laches. In *Demuth v. Old Town Bank,* 85 Md. 315, 326, 37 A. 266, 268, laches was defined by Chief Judge McSherry as follows: "Strictly speaking, and using the term as it is understood in the law, laches is such neglect or omission to assert a right as, taken in conjunction with lapse of time more or less great, and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity."

And in *Oak Lawn Cemetery v. County Commissioners of Baltimore County,* 174 Md. 280, 291, 198 A. 600, 605, it is said that: "The doctrine of laches is an application of the general principles of estoppel. *Pomeroy's Eq. Juris.,* Vol 4, Sec. 1440 * * *: 'Laches, in legal significance, is not mere delay, but delay that works a disadvantage to another. So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no step to en-

force them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable, and operates as estoppel against the assertion of the right'."

The defendants have not been injured by the delay and the suit was instituted promptly after the assertion by the defendants of rights adverse to the plaintiffs' claim of complete ownership of the entire farm. Under the circumstances the plaintiffs are not guilty of laches.

As no evidence was introduced by the defendants in support of the allegations of their cross-bill, there was no error in its dismissal. And there was no error in overruling the demurrer to the amended bill of complaint. As we have already indicated in our discussion of the applicable law, it presented a case entitling the plaintiffs to equitable relief.

The defendants have urged that certain evidence offered by the plaintiffs was inadmissible. We have examined all of the exceptions and find that there was no error in its admission, but even if we found that it was inadmissible, it would not affect the conclusion which we have reached.

*Decree affirmed, with costs.*