## CHESAPEAKE HOMES, INC., ET AL. *v.* McGRATH, ET UX.

[No. 168, September Term, 1967.]

*Decided April 5, 1968.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, McWILLIAMS and FINAN, JJ.

*Manley F. Gately,* with whom were *Cardin & Cardin, Jerome* brief, for appellants.

*S. Cardin, Ginsberg & Ginsberg* and *Hyman Ginsberg* on the

*A. Slater Clarke,* for appellees.

FINAN, J., delivered the opinion of the Court.

Appellants, Chesapeake Homes, Inc., et al. (Chesapeake) have taken this appeal from a decree of the lower court granting rescission of a contract of sale and a deed of conveyance of real estate to the appellees (McGraths).

Chesapeake is engaged in the promotion of real estate subdivisions and the construction and sale of homes therein. Chesapeake sold the McGraths a lot improved with a dwelling known as No. 7015 Cipriano Road, designated as Lot No. 8, Block C of Woodholme Forest Subdivision, Lanham, Prince George's County, Maryland. The contract of sale was dated April 24, 1966, the purchase price being $31,195. Settlement date was July 20, 1966, at which time the deed and the deed of trust securing the purchase money were executed. None of these written instruments contained any metes and bounds description of the property conveyed, the only description being the lot and block designation, with reference to the plat recorded among the land records of Prince George's County.

The particular home which was purchased by the McGraths had been set apart as a model home for the subdivision and Chesapeake had maintained a sales office in this home, a Mr. Speert, the sales manager of Chesapeake, usually being on location and in charge. The McGraths were attracted to the Briarwood model structure on the property and were particularly concerned about the size of Lot 8, Block C with reference to the dimension of the back yard. Inquiry was made by the McGraths as to the location of the rear property line prior to their entering into the contract of sale. At the time they first viewed the property the lot was sodded to only a short distance from the rear of the dwelling, and the McGraths inquired as to whether the lot only went that far. Speert assured them that the rear line of the lot was farther back, and escorted them to a wooden stake which was in line with a projection of the line of three utility poles then standing in the rear of five completed homes on Cipriano Road, the McGraths' property being the southernmost lot of this group. Speert walked the McGraths

along this line and assured them it was the rear boundary line of the lot. This line as projected made Lot No. 8 nearly one-half again as large as it actually was. The truth of the matter was that the pole standing the farthest away from McGraths' lot was the only pole located on the rear property line of any of the lots fronting on Cipriano Road, and the second and third poles, while placed in a visual line with the first, were not on the rear property lines of any of the lots, although an unknowledgeable and imaginative individual might have obtained the erroneous impression that the rear property lines of all five lots facing Cipriano Road formed a straight line coextensive with the utility poles. The rear property line of Lot No. 8, it being an irregularly shaped lot, was completely unrelated to either an extension of the rear property lines of the other four lots, or the projection of the visual alignment of the utility poles. In fact, the rear line was so close to the house that it cut off a substantial portion of the sod already set in. Speert in his testimony at the hearing stated that he actually believed the rear line of the McGrath lot to be an extension of the visual line of the utility poles and, for the purposes of this appeal, it was conceded that this was an honest mistake of fact on the part of Speert.

Between the date of the contract and the date of settlement, a period of almost four months, the McGraths frequently visited this property, and the record reveals several occasions on which they were assured by Mr. Speert and by Mr. Davis, a salesman for Chesapeake, that the rear line of the lot was an extension of the utility pole line. Even on the date of settlement the matter was brought up again by Mr. McGrath in the presence of Mr. Gately, Vice President of Chesapeake, whom McGrath says informed him "the lot went right back to the telephone line extended." Also present at the settlement was Mr. Weinstein, a representative of the title company.

Two of the five owners of houses facing on Cipriano Road near the McGraths testified they too had been shown the extension of the utility line as the rear property line of the lots, including the lot purchased by the McGraths. Actually, after the settlement, Chesapeake did sod back to the projection of the utility pole lines. Debris was also removed from this area, and the McGraths incorporated it into their rear yard.

The memorandum of settlement, which is a printed form type of settlement sheet and is filed as an exhibit, contains an item for a survey charge to be paid by the seller. However, no charge was made for a survey, no survey was produced by anyone or requested by anyone at the time of settlement and apparently no survey had been made of this specific lot with reference to this transaction. Some months later, after litigation was instituted, the McGraths had a survey made of the property. Mr. McGrath also testified that although he had frequently observed the plat of the Woodholme Forest Subdivision on the wall of Chesapeake's office, he had not paid any attention to it because Mr. Speert had advised him: "* * * there is a little plat that is on the wall, but there is no need to look at it because it is confusing." On cross-examination McGrath further testified that Mr. Speert, with reference to this plat, had told him that "* * * it was so small you can't tell the true lot line."

On or about September 1, 1966 the appellees, who for some weeks had been in possession and occupancy, noticed that workmen appeared near their dwelling and were apparently preparing to build a house on the land which had been continuously represented, recognized and utilized as the McGraths' back yard. Upon inquiry they learned that the proposed structure would be situated about 18 feet from the sun deck of their home and approximately 28 feet from their picture window. The McGraths protested against the proposed construction of this dwelling and when it appeared they were being ignored, filed a bill of complaint in equity to restrain Chesapeake from further construction or conveyance of the property to anyone else and asked the court to impose a constructive trust in their favor on the 3,000 square feet which Chesapeake represented as being part of the McGrath lot. It was later ascertained that exactly 3,290 sq. feet in dispute was not part of Lot 8, Block C but was rather part of the adjoining Lot 7, Block C.

Chesapeake, although admitting to an innocent misrepresentation of fact concerning the boundary, argued that the McGraths were not entitled to relief because Mr. McGrath, a practicing attorney who had some experience in this field and represented himself as being a general practitioner of the law, did not exercise reasonable diligence on his own behalf. Chesa-

peake contended that McGrath knew of the subdivision plat hanging on the wall of the sales office, which they presumed he had the opportunity to examine, and was also aware that a plat of the subdivision was on file among the land records of Prince George's County, which plat would show precisely the dimensions, courses, distances and area of each lot. Chesapeake also emphasized that for a nominal sum the McGraths could have obtained a survey of the property showing the location of the dwelling on the property and the corners of the lot. It was also established that if a trust were to be imposed in favor of the McGraths on the 3,290 feet of Lot No. 7, Block C in dispute, the area remaining in Lot 7, Block C would not be sufficient to permit the construction of a dwelling in conformity with the zoning regulations of Prince George's County. Chesapeake argued that its representation involved an innocent mistake, that the McGraths failed to prove that the deficiency in the quantity of land was material and that the court should not attempt to reform the deed or the original contract between the parties. It also argues on appeal that it was error for the lower court to rescind the contract because the equities of the situation did not warrant rescission nor did the McGraths specifically ask for such relief in their bill. Finally, Chesapeake urges upon this Court that if any relief is in order it should be by way of some abatement of the purchase price.

The threshold argument to be resolved in this case is whether the facts give rise to a circumstance which warrants relief for the McGraths.

In *The Glendale Corp. v. Crawford*, 207 Md. 148, 114 A. 2d 33 (1955) this Court in denying a bill for a specific performance referred to Pomeroy, *Equity Juris.* (5th Ed.) :

"In Sec. 891 of the same work, the author points out that where statements of fact which are essentially connected with the subject of the transaction (and are not mere expressions of opinion, hope or expectation, or mere general commendations), 'and especially where they are concerning matters which, from their nature or situation, may be assumed to be within the knowledge or under the power of the party making the rep-

resentation, the party to whom it is made has a right to rely on them, he is justified in relying on them, and in the absence of any knowledge of his own, or of any facts which should arouse suspicion and cast doubt upon the truth of the statements, he is not bound to make inquiries and examination for himself.' This rule has been applied in many cases in other jurisdictions, even though the truth could have been ascertained by an examination of the public records. *Pomeroy, op. cit.,* Sec. 896 (a). No Maryland case is cited on the point." *Id.* at 155; 114 A. 2d at 36.

This Court is not unmindful of the fact that Mr. McGrath was a practicing attorney and as such should be held to the exercise of a greater degree of diligence than that demanded of the ordinary layman in a real estate transaction. However, in the instant case the sales manager of the subdivision certainly would be in as good a position as McGrath, if not better, to have actual knowledge of the location of boundary lines and markers.

We have been referred to the case of *Piper v. Jenkins,* 207 Md. 308, 113 A. 2d 919 (1955) and we think it should control in this matter. In *Piper* the plaintiff was led by the defendant (seller) to believe that certain improvements were within the boundary lines of the subject property. The action was for deceit and the defendant's demurrer, sustained by the trial court, was overruled on appeal. Although the case involved a question of law not material to the case at bar, the language of Judge Delaplaine's opinion provides guidance:

"We hold that a purchaser of land has a right to rely upon representations made to him by the vendor as to its location when the facts concerning which the representations are made are unknown to the purchaser; and the vendor can be held liable for damages if he makes a false representation as to its boundaries with knowledge of its falsity or with reckless disregard for its truth or falsity, and the purchaser relies upon it. *Davis v. Nuzum,* 72 Wis. 439, 40 N. W. 497, 1 L.R.A. 774; *Hoock v. Bowman,* 42 Neb. 80, 60 N. W. 389; *Lawson v. Vernon,* 38 Wash. 422, 80 P. 559; *McFer-*

*ran v. Taylor and Massie,* 3 Cranch 270, 2 L. Ed. 436, 440.

\* \* \*

"But where the boundaries of land are unmarked and the vendor undertakes to point out the boundaries to the purchaser, he is under an obligation to point them out correctly; and the purchaser has a right to rely upon such a representation, without being required to make an examination of the land records or to employ a surveyor to make a plat of the land, and he can hold the vendor liable for any fraudulent misrepresentation. *Gustafson v. Rustemeyer,* 70 Conn. 125, 39 A. 104, 39 L.R.A. 644; *Rohrof v. Schulte,* 154 Ind. 183, 55 N. E. 427; *Ballard v. Lyons,* 114 Minn. 264, 131 N. W. 320, 38 L.R.A., N.S., 301; *McGibbons v. Wilder,* 78 Iowa 531, 43 N. W. 520; *McGhee v. Bell,* 170 Mo. 121, 70 S. W. 493, 59 L.R.A. 761; *Lanning v. Sprague,* 71 Idaho 38, 227 P. 2d 347, 350." *Id.* at 313, 113 A. 2d at 921.

*Cf. Freed v. Cloverlea Assn.,* 246 Md. 288, 305, 228 A. 2d 421, 431 (1967).

We think that on the basis of *Piper* relief is in order; thus the next question to be answered is the form that this relief should take. The McGraths' bill in effect requested reformation of the contract so that the dimensions of their property would include the 3,290 feet situated in Lot No. 7, Block C, and the appellants concede that they were guilty of an innocent misrepresentation of fact. In many respects an innocent misrepresentation of fact may amount to no more than a mutual mistake of fact, and thus, equitable remedies such as rescission, restitution and reformation might be decreed. However, this does not always hold true. For instance, the lower court correctly observed that, whereas *Mattingly v. Houston,* 235 Md. 54, 200 A. 2d 160 (1964) involved a somewhat similar factual situation, and the remedy of reformation was granted on the basis of a particular mistake of fact, equity will not reform a contract on the basis of innocent misrepresentation. In *Mattingly,* the mutual mistake occurred in the written deed, not in

the negotiations or identity of the subject matter of the contract. The court granted reformation so that the deed would convey what the parties intended it to convey by their previous agreement. See also *Painter v. Delea, Att'y,* 229 Md. 558, 184 A. 2d 913 (1962). On the other hand, where the facts show the mutual mistake to be actually a product of false, although innocent, representations as to the subject matter of the contract, the result is that the parties have not in fact come to any agreement, and reformation will not correct the error. This is easily observed within the facts of the present case, for it is not the description of the land in the contract which is a mistake, but the identity of the lot itself. Therefore, reformation was not the proper remedy.

This Court has frequently adhered to the rule that rescission will be decreed only upon proof of a justifiable reliance on a material misrepresentation. See *Carozza v. Peacock Land Corp.,* 231 Md. 112, 121, 188 A. 2d 917, 921 (1963) :

> "In a business transaction, reliance upon a misrepresentation of fact, intentionally misrepresented or otherwise, is justifiable only if the fact misrepresented is material. A fact is material if its existence or nonexistence is a matter to which a reasonable man would attach importance in determining his choice of action in the transaction, or the maker of the misrepresentation knows that its recipient is likely to regard the fact as important although a reasonable man would not so regard it."

See also *The Glendale Corp. v. Crawford,* 207 Md. 148, 158, 114 A. 2d 33 (1955) ; *Brodsky v. Hull,* 196 Md. 509, 515, 77 A. 2d 156, 159 (1950). A misdescription of the estate, interest or extent of the property on a material and substantial point is enough to avoid the contract. However, the plaintiff must show that he purchased without knowledge of the defect and that he suffered some injury or loss. *Boring v. Jungers,* 222 Md. 458, 465, 160 A. 2d 780, 784 (1960) ; *The Glendale Corp. v. Crawford, supra.* Furthermore, because the misrepresentation is made without *scienter* or fraudulent intent, the element of materiality must be clearly established. *Clark v. Kirsner,* 196 Md. 52, 56, 74 A. 2d 830, 832 (1950).

Needless to say, the materiality of a misrepresentation turns on the facts of the particular case. In this case, the appellants' assurance that the property line extended to the line of the utility poles was repeated and repeated again during the course of the negotiations. However, what makes the representation material is not the frequency and confidence with which the assurances were made, but the knowledge on the part of the appellants that the appellees both desired and expected to receive a piece of property almost 50% larger than that which they actually received. On the first visit to the site, the appellees, thinking that the end of the sod was the lot line, expressed little interest in purchasing the house, and gave as their reason the size of the lot. This was the first time that the appellants stated that the lot did not terminate with the sod, but ran to the line of the utility poles. The conclusion is inescapable that without the additional 25 to 40 foot extension, the appellees would have been unwilling to purchase the house.

The appellants also argue that the appellees are estopped from rescinding the contract by their failure to look on the wall plat of the subdivision, which would have revealed the true line of the lot they purchased. There is ample evidence that Mr. Speert convinced the McGraths that the wall plat was small and somewhat confusing, and that they should rely on his word that the lot extended to the utility pole line. Consequently, the appellants are not in a position to raise an estoppel against the McGraths. One claiming the benefit of an estoppel must not only be free from fraud in the transaction but he must also act with good faith and reasonable diligence; otherwise no equity arises in his favor. See *H. H. Scott, Inc. v. Annapolis Electroacoustic Corp.,* 195 F. Supp. 208, 218 (D. Md. 1961); *Savonis v. Burke,* 241 Md. 316, 320, 216 A. 2d 521, 523 (1966) (dictum); *J. F. Johnson Lumber Company v. Magruder,* 218 Md. 440, 448, 147 A. 2d 208, 212 (1958). Aside from the position of the appellants we do not find evidence of any conduct on the part of the McGraths which would preclude their obtaining equitable relief. The cases of *Wolin v. Zenith Homes, Inc.,* 219 Md. 242, 146 A. 2d 197 (1958) and *Ortel v. Upper Ashburton Realty Co.,* 171 Md. 678, 190 A. 239 (1937), cited by the appellants in support of their argument of estoppel, are not appli-

cable to the instant situation, the former case involving an express waiver of the breach and the latter, a ratification of fraud.

Chesapeake, in addition to denying the right of the McGraths to any relief, takes issue with the nature of the specific relief decreed by the lower court. It is true the McGraths did not pray for rescission of the contract but rather for reformation and the imposition of a constructive trust. However, we are of the opinion the lower court's decree for rescission came within the framework afforded by the prayer for general relief and was not inconsistent with the general scope and object of the bill of complaint. In *McKeever v. Realty Corp.*, 183 Md. 216, 224, 37 A. 2d 305 (1944) we said:

> "* * * Under a prayer for general relief, the court is not confined to the relief which is specifically prayed for, but may grant any needed relief which is not inconsistent with the special prayers. Even where the nature of the case is such that the prayer for specific relief cannot be granted, relief may be granted under the general prayer suitable to the peculiar nature of the case. While a complainant is not entitled to relief beyond the general scope and object of the bill or inconsistent with it, the court is left free to adopt any mode by which it can most readily and effectually administer that relief which the equity of the case may require. *Townshend v. Duncan*, 2 Bland 45, 48; *Polk v. Rose*, 25 Md. 153, 162, 89 Am. Dec. 773; *Sloan v. Safe Deposit & Trust Co.*, 73 Md. 239, 249, 20 A. 922; *Boehm v. Boehm*, 182 Md. 254, 34 A. 2d 447; *Borssuck v. Pantaleo*, 183 Md. 148, 36 A. 2d 527."

See also Miller, *Equity Procedure*, § 100.

The lower court held the McGraths were entitled to a rescission of the contract, the deed of conveyance, the return of all consideration paid under the contract and to be released from any obligations under the deed of trust and the promissory note which it secured. We think the order directing this relief should be affirmed.

*Order affirmed, with costs.*