# POTOMAC ELECTRIC POWER COMPANY *v.*
# LESTER F. LYTLE ET AL.

[No. 233, September Term, 1974.]

*Decided November 22, 1974.*

The cause was argued before THOMPSON, MOORE and LOWE, JJ.

*Thomas F. Mudd* for appellant.

*Marvin H. Schein* for appellees.

LOWE, J., delivered the opinion of the Court.

Around the turn of the century William Arthur Dunkerley said that "To every man there openeth a way, and ways and a way. . . ." Over sixty years later the Potomac Electric Power Company (Pepco) said to Lester, Paul and Margaret Lytle that the way to their property, used for more than half century, was no longer open to them. Pepco's action left the Lytles with no access to their retreat on the Paskahansa Creek, except by water.

Appellees Lester F., Paul E. and Margaret Lytle are the owners as tenants in common of a one-half interest in a three acre point of land, known as "Jones Point," which protrudes into Paskahansa Creek. Their interest was derived in 1957 from Noah Lytle who was the father-in-law of Margaret and the father of Lester and Paul. Noah Lytle had acquired the property as a tenant in common with a "Mr. Menguel."

The property is improved by a house and, with the exception of the riparian boundaries, is surrounded by a four hundred and fifty-three acre farm. Since at least 1919, ingress and egress from the nearest public way (which is now Route #301) to the dominant "Jones Point" was over a dirt or gravel road crossing the servient farm then owned by John Matthews, known as "Laidloes Ferry" (more recently renamed "Rosedale"). No difficulties ever arose regarding that use for at least fifty-five years, during which Lester and Paul Lytle remembered regularly using the road. In their youth, on nearly every weekend they were taken to "Jones Point" by their parents, and after their maturity they reciprocated by taking their parents, or they journeyed alone. Until approximately five years

ago, these trips occurred every year throughout "[p]racti-
cally the entire year, off and on, one or the other of us,
either hunting, fishing or vacationing," would traverse
the right-of-way to the bucolic sanctuary. The appellees
with or on behalf of their father maintained the right-of-
way to the point. There occurred one incident when Mr.
Matthews who then owned the Laidloes Ferry farm ". . .
tore it [the right-of-way] up hauling crops in. He repaired
it, apologized, and repaired the road."

In 1957 appellant Pepco, as an undisclosed principal,
purchased the "Laidloes Ferry" farm. Sometime soon
thereafter it also acquired the one-half interest in "Jones
Point" from Mr. Menguel.

In 1963 Pepco sought to barricade the right-of-way with a
chain. Lester Lytle "sawed the lock off" and "continued to
use it [the right-of-way] clean up to about five years ago."
The erection of a chain link fence at that time foreclosed
any further use of the access road. With the exception of one
entry, made through another road built by Pepco, the Lytles
have been reduced to occasional visits to their property by
boat. During the interim their boats and furniture have been
stolen and their home has deteriorated.

Appellees sought to enjoin Pepco from obstructing their
right-of-way. The case was heard by the Honorable Joseph
A. Mattingly presiding as Chancellor in the Circuit Court for
Charles County. Judge Mattingly found:

> ". . . that this piece of land down there had a
> right-of-way to it and the right-of-way came out
> through Pepco's property and Pepco can't come in
> here and deny a right-of-way to that property nor
> depress the value of this property.
>
> Now Pepco has had some fifteen years, as has
> been pointed out by counsel, has had fifteen years
> in which to file a petition [partition] proceeding, to
> file a condemnation proceeding, and has done
> neither.
>
> And the Court feels that it certainly would be a
> grave injustice to the Plaintiffs here to deny them

> that they have a right to this property in there and deny them this right naturally would depress the value of the land to a great extent."

After reviewing the record we agree with the Chancellor that appellees met their burden of proving "an adverse, exclusive and uninterrupted use of the way for twenty years." *Zehner v. Fink,* 19 Md. App. 338, citing *Condry v. Laurie,* 184 Md. 317.

## Burden of Proof

Appellant questions the specificity of description of the way in question, and argues that the appellees failed to meet their burden by omitting "center line descriptions or metes and bounds references to the boundaries thereof. . . ." Having never questioned the physical presence or location of the right-of-way at the trial below, the issue is not before us. Md. Rule 1085. Even assuming the necessary foundation, however, we find the way adequately described.

Appellees introduced three plats all of which had the way clearly marked upon them. One was the tax assessor's record [Planimetric Manuscript T-10915], one was a survey plat of the farm prepared by a registered surveyor in 1957 (apparently pursuant to Pepco's purchase) and the third was a plat prepared for Pepco pursuant to a proposed "Dolphins and Barge Unloading Dock in The Potomac River." These plats clearly indicate the existence of the way. Appellees are not required to introduce a precise metes and bounds description of the way, as long as its location is ascertainable. The way was shown with considerable precision on the plats. On one plat, a portion even showed locations and directions marked by surveyor's stakes as well as metes and bounds descriptions. That the remainder was drawn by the surveyor without the metes and bounds set forth does not mean it lacked the specificity necessary to determine its location.

Appellant's further argument that appellees failed to submit sufficient proof, focused upon an alleged discrepancy between the Lytle brothers' testimony as to where each left

the public road to enter upon the way which crossed the servient farm. The plat markings indicated the way was Y-shaped with the base terminating at Jones Point, and each prong of the fork intersecting Route #301. On cross-examination Paul marked a different point of ingress than had Lester; however, the record shows that the matter was clarified on redirect when Paul's recollection was refreshed and he recalled that upon entering the premises they had:

> ". . . passed . . . to the, actually it would be to the north of [the cemetery].
>
> Q. Now, do you find the cemetery on this map?
>
> A. Yes, here is the cemetery.
>
> Q. Does that line up the way you recall it?
>
> The cemetery would be to the right of the —
>
> A. To the left of the road, well, to the right of the road as you come in."

Appellant relies on nothing else for its argument that plat references without markings made the testimony utterly incomprehensible on review.

As Judge Thompson stated in *Zehner, supra,* "While the testimony is not as clear as desirable, it is sufficient for us to decide the issues as presented." *Id.* at 339. When we consider that memories of events occurring on land as much as fifty years ago were being tested by use of maps and plats, we find the evidence reasonably clear—certainly not "utterly incomprehensible" as described by appellant.

## The Presumption of Adverse Use

Having found that appellees met their responsibility by proving all the necessary elements of prescription, we need hardly note that in doing so they proved *inter alia* that they had ". . . used a roadway over the land of another openly and continuously and without objection for twenty years." By doing so, a presumption of adverse use under claim of right arose in their favor. *Zehner,* 19 Md. App. at 344. This presumption of adverse use is *rebuttable by evidence of*

permission or license inconsistent with a claim of right. *Wilson v. Waters*, 192 Md. 221, 227. That it rebutted that presumption is projected as appellant's second contention, a contention with which we do not agree.

Louise Matthews, daughter of John Matthews, the former owner of Laidloes Ferry, deposed before trial that she knew of no arrangements made between her father and Mr. Lytle relative to the use of the road. However, she did say that:

> "They have discussed it lots of times and laughed about it, and he [John Matthews] said, 'You can always come through my property.' He was very fond of him, [Noah Lytle] and he never expected to pass on at that time, and I don't imagine Mr. Lytle did, and it was a verbal understanding that he was to be able to come through the property always."

Appellant complains that the Chancellor stated that in determining whether the reference to a "verbal understanding" meant permission or an expressed understanding of Mr. Lytle's right to use the way, the testimony should be viewed "in light most favorable to the Plaintiff." Though not technically correct, the result thus obtained is not dissimilar to that achieved with the proper interpretive standard. Since appellant now had the burden of proving permissive use, the Chancellor's statement merely indicated that he would favor appellee unless persuaded contrarily by appellant's affirmative showing. Although Miss Matthews' statement might have allowed an inference of permissive use, the Chancellor evidently thought that mere "possibility" inadequate to overcome the presumption of adverse use. This testimony might as easily have been reflective of a prior undertaking by the owner of the farm to confer upon Mr. Lytle a perpetual right of use in the way. Although unenforceable under the Statute of Frauds, Mr. Lytle's assumption of irrevocability and use of the way thereafter would have been indicative of a claim of right, and thus adverse to Matthews and his successors in interest. "An oral permission, believed to be irrevocable but unenforceable by reason of the Statute of Frauds, may

evidence a claim of right and indicate that user was adverse and not permissive." *Lichtenberg v. Sachs*, 200 Md. 145, 154. Tiffany, *Real Property*, § 1196, p. 562 (3d ed.). Other testimony of the same witness supports the view that there was no oral permission granted.

"Q So if, in fact, Mr. Lytle did use that road, he used it without your permission; is that correct?

A Which road?

Q The dotted line from Route 301.

A He may have. I'm quite sure father wouldn't have objected.

Q Do you recall whether or not your father gave him explicit permission to use that road?

A No, because I don't remember his coming through there, especially. I remember distinctly when he came from here (indicating), from the Newburg road, and his family.

Q Did you ever give him permission?

A I never felt that I had to.

Q Since 1951, when you were responsible for management of the property —

A I never felt that I had to.

Q — as far as you were concerned, it was all right for him —

A Yes.

Q You never explicitly gave him permission?

A No.

Q But you did know he used it?

A Yes.

Q As far as you know, he used it back to the time when it was originally built?

A You mean until 301 was built?

Q Until you sold the property to PEPCO.

A I'm quite sure he did."

Appellant, having offered no more than testimony

amenable to competing inferences, did not meet its burden of clearly convincing the Chancellor that the use of the way was inconsistent with a claim of right.

## Laches

Appellant's final argument is that appellees were guilty of laches and having "slept upon their rights must be remitted to the repose from which they should not have been aroused." *Ripple v. Kuehne,* 100 Md. 672, 677. The short answer to this is found in uncontradicted testimony at trial.

Pepco purchased its farm in 1957 and the tenancy in common with the Lytles soon thereafter. It has been negotiating with the Lytles "off and on" since that time, attempting to obtain their interest in "Jones Point." Mr. Alvin Turner, "the principal real estate representative" of Pepco testified:

"Q. You have been negotiating with them since 1957?

A. Off and on, yes. Them and their attorney, right.

Q. Is it true that you were attempting to locate similar waterfront property to try to locate a switch with them?

A. We made this offer to Messrs. Lytle, Mr. Lytle said he wanted a place back in the woods where it was quiet, similar to what he said he had now and we said if we could find something for them, so I contacted all the local real estate brokers and one day he came down and we looked at, I don't know, four or five pieces, as recently as I guess in the last few months, that you are aware of, he has also looked at some other property that some local brokers have had, but nothing has suited him."

Mr. Lester Lytle's testimony also acknowledged the negotiations:

"Q. When and how frequently did you meet with him and for what purpose?

A. I met with him one time when he wanted to borrow the property, another time on, several times he was to acquire us a comparative piece of property, which he never came up with, he wanted us to look for something and then tell him what it was and he being in the real estate line, we referred it to him, to do the bird dogging and he came up with, oh, I would say four or five pieces of what I would call junk land up until recently, showed us a piece on Nanjemoy Creek, but all he had showed us prior to that was nothing but junk.

Q. Over what period of time was that?

A. That was over the last five years, since the fence run up."

Thus, the five year period of negotiations coincides with the five year period following Pepco's erection of a fence foreclosing access. Prior to that time the appellees continued to assert their rights to the point of cutting the lock on the chain gate erected by Pepco.

In any case, it is difficult to see how laches could apply to failure to assert a prescriptive right for a period less than that necessary to acquire it. The easement was perfected only after the twenty year prescriptive period and could have been "abandoned" by non-use only after an equal period, *Allori v. Dinenna*, 188 Md. 1, 4. The doctrine of abandonment applicable to rights-of-way, would appear a more appropriate guide to what constitutes laches in these cases than the three year limitation period appellant suggests. Using similar reasoning-by-analogy, the Court of Appeals compared an equitable lien obtained as owelty on a purpart to a mortgage lien in determining that a lapse of twenty years was necessary to raise the presumption that such lien had been satisfied. *Balto. and Ohio R.R. Co. v. Trimble*, 51 Md. 99.

Finally, the Court of Appeals has held that prejudice or injury to the party asserting laches is an essential element. *Simpers v. Clark*, 239 Md. 395, 403. The record is barren of any attempt to show prejudice or injury as a result of the

alleged delay. Stretching as far as possible to find any evidence construable as prejudice, the appellant points only to testimony elicited to provide the reasons why Pepco sought the common interest they acquired in the 3 acre "Jones Point" and presumably why they sought appellees' interest:

> "Well, we have constructed an electric generating station on this large portion of property, and the security necessary around one of these generating stations, I think is obvious. The power generated at this station is used by the Capital of the United States and the reliability of this power to the Capital of the United States is a very significant part.
>
> The property is fenced, and we have a guard force that controls access, even, most of our own employees are not permitted on this property without a special pass, unless they are employed at that facility or are there for a special purpose, so the purpose of acquiring this was to have the entire property that lay between Paskahansa Creek and the highway."

In its latest attempt to congeal the mercurial doctrine of laches, the Court of Appeals, through Judge O'Donnell, specially assigned from the Supreme Bench of Baltimore in the case of *Salisbury Beauty Schools v. State Board,* 268 Md. 32, 63 said:

> "As was held in *Lipsitz v. Parr,* 164 Md. 222, 164 A. 743 (1933), laches is an inexcusable delay, without necessary reference to duration, in the assertion of a right, and, unless mounting to the statutory period of limitations, mere delay is not sufficient to constitute laches, if the delay has not worked a disadvantage to another. See *Bradford v. Futrell,* 225 Md. 512, 525, 171 A. 2d 493, 500 (1961). 'The doctrine of laches is an application of the general principles of estoppel.' *Oak Lawn Cemetery*

*v. Baltimore County,* 174 Md. 280, 291, 198 A. 600,
605 (1938), citing *Pomeroy's Eq. Juris.* Vol. 4, § 1440.
See also *Boehm v. Boehm,* 182 Md. 254, 269, 34 A.
2d 447, 454 (1943). Prejudice or injury to the party
raising 'laches' is an essential element. *Simpers v.
Clark,* 239 Md. 395, 403, 211 A. 2d 753, 757 (1965). So
long as the position of the parties is not changed
and there is no prejudice from the delay laches are
inapplicable. *Oak Lawn Cemetery v. Baltimore
County, supra.*"

Appellant has provided us neither indicia of prejudice nor
justification for denying appellees the access to their
property which they had used for over half century.

> *Judgment affirmed.*
> *Costs to be paid by appellant.*