THE GLENDALE CORPORATION *v.* CRAWFORD
ET UX.

[No. 83, October Term, 1954.]

150

*Decided May 11, 1955.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*W. Hamilton Whiteford,* with whom were *Due, Nickerson, Whiteford & Taylor,* on the brief, for appellant.

*Foster H. Fanseen,* for appellees.

BRUNE, C. J., delivered the opinion of the Court.

The appellant, The Glendale Corporation ("Glendale"), brought suit in the Circuit Court for Baltimore County for specific performance of two contracts for the purchase of adjoining lots in a new residential development on the outskirts of Baltimore City. The defendants-appellees, the Crawfords, filed an answer which also served as a cross-bill for rescission of the contracts and for the refund of their deposit on the purchase price on the lots. The decree of the trial court dismissed the bill and granted the relief prayed by the appellees, with interest and costs. The appeal is from that decree.

The first contract was executed on May 4, 1953, and the second two days later. The second contract was entered into because the first lot was found not to be large enough for the type of house which the Crawfords contemplated building. The balance of the purchase price of the two lots was payable on September 13, 1953. Just before the settlement was due Mr. Crawford wrote to Glendale's agent stating the houses being built at Glendale were not of the type which they believed would be constructed and that "If we build the house for which we have plans, we feel that we would be 'overbuilding' the development, and it would be an unwise investment." For these reasons they requested a refund of their deposit.

When Glendale brought this suit the Crawfords asserted in their answer that they had been induced to execute the contracts by false, misleading and untrue statements to the effect that: (1) the lots were "to remain and stay in their natural state of beauty and contour;" (2) only homes of certain sizes, types and price ranges were to be built in the development; and (3) homes were to be built individually and not commercially; and (4) all homes built would have to be approved by Glendale as complying with the foregoing requirements.

The principal controversy at the trial related to the grading of an adjacent lot, which had been cut down to

such an extent that the roof of the house built thereon was approximately level with the Crawfords' lots, and a virtual cliff had been created by the grading excavation.

There was testimony by the Crawfords in support of their allegations relating to the representations which they claimed had been made to them by Glendale's agent, Mr. C. Preston Scheffenacker, Jr.; and there was a conflict between their testimony and Mr. Scheffenacker's on several points, particularly with regard to the cost of houses to be constructed in the development and on the question as to whether houses were to be built exclusively by home owners or might be constructed by builders for resale (referred to in the testimony as "speculative building").

On the matter of grading and elevation, it appears that there are streets along two sides of the Crawfords' lots, and the appellant states that these had been graded before the Crawfords signed the contracts here in suit. The Crawfords' testimony shows that they wanted a high lot. The grading of the adjoining lot was done by the owner, not by Glendale, but it was done under plans submitted to and approved by Glendale's architect. Such approval was required—as well as the approval of house plans—under the restriction placed upon the Glendale development.

These restrictions are said by Mr. Schenffenacker to cover nine pages, and they had been duly recorded. The Crawfords did not examine them, but did discuss them with Mr. Scheffenacker. In response to a question as to whether he had made any representations to the Crawfords about grading Mr. Scheffenacker replied that he became "more or less standardized" in his statements and that he would say, if asked to cut lots down or to remove trees, that "Glendale sells the lots as is and we will not grade lots that have been sold." He further testified with regard to the requirements for approval of grading plans by Glendale's architect, and that, on the subject of the cost of homes, he would state that "the

price is not taken into consideration; you can build a $40,000 home which is not acceptable" and the architect's approval must be obtained.

The Chanecllor's opinion is concerned with the matter of grading and states: "It is impossible for the Court to believe that any sensible person would have purchased the property if he had been apprised of the grading plans that the complainant corporation contemplated making. The lots at the present time may be likened to a small mesa with precipitous cliffs approximately twenty feet in height on three sides. It would be an extremely expensive operation to grade this land and bring it in line with the neighboring property and the streets. The testimony is to the effect that the defendants desired a high lot but they could not have contemplated any such fantastic elevation as has been left after the grading of the surrounding property by the complainant. * * * I do not believe it to be necessary to go into any legal aspects of the case as the thing speaks for itself. It would be grossly inequitable to compel the defendant to take the lots as they are now. A home erected on the present location would be a virtual cliff dwelling and be almost as inaccessible. It would be incredibly foolish to even consider building as it now is."

Each of the contracts contained the following provision: "This contract contains the final and entire agreement between the parties hereto, and neither they nor their agents shall be bound by any terms, conditions or representations not herein written."

The evidence shows that in the latter part of September, 1953, the Crawfords decided to buy another lot in an entirely different development and that they have since constructed a house on the new lot. The appellant suggests strongly that their refusal to complete the purchase of the Glendale lots was due to a change of heart about the bargain which they had made.

The chief question on this appeal is whether or not the contract should be specifically enforced.

The general rule with regard to specific performance of contracts for the sale of land has been stated many times. Specific performance is not a matter of absolute right in the party but of sound discretion in the court. This discretion is not, however, arbitrary; and where the contract is, in its nature and circumstances, unobjectionable—or, as it is sometimes stated, fair, reasonable and certain in all its terms—it is as much a matter of course for a court of equity to decree specific performance of it as it is for a court of law to award damages for its breach. See, among other cases which might be cited, *Smoot v. Rea,* 19 Md. 398; *Brewer v. Herbert,* 30 Md. 301; *Popplein v. Foley,* 61 Md. 381; *Rogers v. Dorrance,* 140 Md. 419, 117 A. 564; *Camden Sewer Co. v. Salisbury,* 162 Md. 454, 160 A. 4; *Soehnlein v. Pumphrey,* 183 Md. 334, 37 A. 2d 843; *Taussig v. Van Deusen,* 183 Md. 436, 37 A. 2d 915.

The fairness or hardship of a contract is to be judged as of the time when it was made and no subsequent change which may make it less beneficial to one of the parties is material unless the change is in some way the fault of the party seeking its specific execution. *Cochran v. Pascault,* 54 Md. 1 (citing *Smoot v. Rea* and *Brewer v. Herbert, supra*); *Lucas v. Long,* 125 Md. 420, 94 A. 12.

In this case the appellant seeks to avoid the application of that exception by urging that the Chancellor's opinion indicates that he proceeded upon the erroneous belief that Glendale itself had done the grading to which the Crawfords object. This, however, does not dispose of the point. It seems clear that Glendale had retained some control over grading through the requirement that any grading plans had to be approved by its architect; and because of this control Glendale cannot escape all responsibility for the change in grade made by a purchaser with its general consent and with the specific consent of its architect.

The Chancellor also stressed the hardship to which the Crawfords would be subjected if specific performance were decreed, because of the expense to which they

would be put in grading their lots so as to bring them into conformity with the neighboring property and streets. Insofar as the streets and access thereto are concerned we find some difficulty in following his opinion, because the general grade of the street seems to have been established before the Crawfords signed the contracts and no reason appears why they should have expected to go to and from their lots over the land of their neighbors. However that may be, the Chancellor's opinion, based upon his inspection of the site, gives the strong impression that the grading of the adjoining lot put the finishing touch to the elevated (if not splendid) isolation of the Crawford lots and thereby made extensive and expensive grading down of those lots a virtual necessity.

The appellant stresses the fact that no objection on the score of grading was made by the Crawfords prior to the settlement date under their contracts. On the other hand, the evidence suggests that the grading of the adjoining lot had not taken place up to that time. If that is so, it is difficult to see why they should now be bound by a failure to raise the objection then, if their silence might operate as an estoppel or waiver (which we do not decide); nor do we find it necessary to decide whether the Crawfords would have lost all right to object to the grading and to seek rescission if they had paid the balance of the purchase price on the due date and the grading had been done thereafter.

There was direct testimony before the Chancellor of a representation that the general contour of the land was not to be disturbed, and the Chancellor's opinion makes it clear, we think, that the change in grade of the neighboring lot is material to the contracts which the Crawfords signed. See *Pomeroy, Equity Juris.*, 5th Ed., Sec. 898. In Sec. 891 of the same work, the author points out that where statements of fact which are essentially connected with the subject of the transaction (and are not mere expressions of opinion, hope or expectation, or mere general commendations), "and especially where they are concerning matters which, from their nature

or situation, may be assumed to be within the knowledge or under the power of the party making the representation, the party to whom it is made has a right to rely on them, he is justified in relying on them, and in the absence of any knowledge of his own, or of any facts which should arouse suspicion and cast doubt upon the truth of the statements, he is not bound to make inquiries and examination for himself." This rule has been applied in many cases in other jurisdictions, even though the truth could have been ascertained by an examination of the public records. *Pomeroy, op. cit.*, Sec. 896 (a). No Maryland case is cited on the point.

In *Kappelman v. Bowie*, 201 Md. 86, 93 A. 2d 266, the owners of a piece of property who had first acquired the leasehold interest in it and had later redeemed the ground rent decided to sell the property. They authorized a real estate agent to sell it for $9,500, subject to a $90 ground rent to be created. They later entered into a contract through that agent to sell it in fee for $7,500. At the time of the execution of the contract they testified that they asked him, "What about the ground rent?" and that he replied, "That will be taken care of." The purchaser sought specific performance and it was denied on the ground of mistake on the part of the sellers and inadequacy of price, though the Court stated that such mere inadequacy, standing alone, would not be a sufficient ground for denying specific performance.

Here the representation as to grading under which the Crawfords acted seems to have produced a mistake comparable to that in the *Kappelman* case. Parol evidence is admissible to show a mistake, as the *Kappelman* case indicates. See also *Pomeroy, Equity Juris.*, 5th Ed., Secs. 860, 862, and *Gordon v. Gross*, 141 Md. 490, 119 A. 267; *Diffenderffer v. Knoche*, 118 Md. 189, 84 A. 416; *Somerville v. Coppage*, 101 Md. 519, 61 A. 318; and we think a mistake induced by misrepresentation is no more immune from attack than is a mistake induced by one's own agent, as in the *Kappelman* case.

The appellant cites *Schnader v. Brooks,* 150 Md. 52, 132 A. 381, and *Gontrum v. City of Baltimore,* 182 Md. 370, 35 A. 2d 128, in support of the proposition that the representation relied on by the Crawfords is a representation of some future or contingent event and not of an existing fact. We do not agree that this rule is applicable to this case. Although the representation relates to the future preservation of the grade, we think that it may also be properly construed as a representation that Glendale, which undoubtedly could have made provisions in its restrictions to preserve the general contours of the land, had done so.

To defeat a suit for specific performance, it is not necessary to show that a material misrepresentation was made with knowledge of its untruth or with any fraudulent intent. (As is stated by *Pomeroy, Equity Juris.,* 5th Ed., Sec. 889,) "It is sufficient to defeat a specific performance that the statement is actually untrue so as to mislead the party to whom it is addressed", (and that) "With respect to its effect upon the specific performance of a contract, a party making a statement as true, however honestly, for the purpose of influencing the conduct of the other party is bound to know that it *is* true, and must stand or fall by his representation." This view is supported by *Ginther v. Townsend,* 114 Md. 122, 78 A. 908, which is one of the cases cited by *Pomeroy.* See also, *Restatement, Contracts,* Sec. 367 (a) ; *Warren Manufacturing Co. v. Baltimore,* 119 Md. 188, 86 A. 502.

What we have said with regard to representations as to maintenance of the existing contours is largely applicable to the representations which the Crawfords assert were made as to the cost of houses to be built in Glendale, and it seems unnecessary to go into this matter extensively. It may be noted that the size of the house which the Crawfords proposed to build—and probably its cost, too—must have been known to Glendale's sales agent from the fact that two days after signing a contract to purchase one lot the Crawfords contracted to buy an adjoining lot, because the first one alone was not

big enough for the house which they planned.

Hardship is an element which a court of equity may consider in deciding whether or not to enforce a contract specifically, and specific performance may be refused if it would be burdensome to the defendant and of little benefit to the plaintiff. *Restatement, Contracts*, Sec. 367 (b). *Pomeroy, Equity Juris.*, 5th Ed., Sec. 1405 (a) ; *Powichrowski v. Sicinski*, 139 Md. 376, 114 A. 899; *Linthicum v. Washington, B. & A. Elec. R. Co.*, 124 Md. 263, 92 A. 917; *Smith v. Meyers*, 130 Md. 64, 99 A. 938; *Abell v. Safe Deposit & Trust Co.*, 192 Md. 438, 64 A. 2d 722. In view of the evidence indicating that the land has appreciated in value, it seems that Glendale, whose business is described by its vice-president as buying and selling land and disposing of its wares would have little difficulty in effecting a resale, notwithstanding the grading, but the property would be useless to the Crawfords.

On the matter of specific performance we think that the evidence both of misrepresentation and of relative hardship and benefit was sufficient to support the Chancellor's dismissal of the original bill.

On the matter of rescission and the refund of the $500 deposit made by the Crawfords, which constitutes the second question in the case, we also think that, although a stronger case is requisite to establish a right to rescind than to defend against specific performance (*Pomeroy, Equity Juris.*, 5th Ed., Sec. 1405 (a) ; *Black, Rescission of Contracts*, 2d Ed., Sec. 12; *Hollis v. Hayes*, 1 Md. Ch. 479), the evidence is also sufficient to sustain the Chancellor's decree. The appellees have abandoned the charges of fraud which they set up in their answer, but material misrepresentations, even though innocently made, may be sufficient to warrant rescission. *Williston, Contracts*, Rev. Ed., Sec. 1500; *Restatement, Contracts*, Sec. 476 (1) ; *Pomeroy, op. cit.*, Sec. 888. Cf. *McKeever v. Washington Heights Realty Co.*, 183 Md. 216, 37 A. 2d 305. Also, the appellant's reservation of some control over the grading of adjacent lots and its assent to the change which has contributed to the re-

sulting physical situation which strongly impressed the Chancellor when he viewed the premises, tend to support his conclusion.

We conclude that the decree dismissing the appellant's bill for specific performance and ordering the refund of the deposit paid by the appellees should be affirmed.

*Decree affirmed, with costs.*

HAMMOND, J., filed the following dissenting opinion:

The way of the transgressing reneger was made easy by the chancellor and this Court approved. To me, the decision is unfounded on the facts and unfortunate in result and implications. I would reverse.

The appellees entered into a written contract for the purchase of two lots in a suburban development, which was definite, certain and specific. The contract described the lots by numbers on a plat duly recorded, and provided that the land sold was subject to restrictions applicable to all lots on that plat, as set forth in a deed duly recorded, the place of reference being noted. The fifth restriction provides that no building, wall, fence or other structure shall be built or changed until the plans and specifications "and the grading plan of the plot" shall have been submitted to and approved in writing by the appellant. The right was reserved to reject any plans or specifications or "grading plan" not suitable or desirable, for aesthetic or other reasons, in relation to the site itself or by reason of the effect of the building or the grading plan on the outlook of adjacent or neighboring properties. If the appellant found it desirable or necessary, it could submit the proposed plans to an architect, selected by it but paid by the property owner. Restriction number seven reserves to the appellant the right at any time of grading any street, or afterwards, to enter upon any abutting lot and grade the portion adjacent to the street at a slope of two to one. It was not obligated to do so, or to maintain the slopes after the grading. Paragraph eight of the re-

strictions reserves the right to change the grade of streets at any time or from time to time.

The appellees, both of whom were in business, admitted that they read the contract before signing it, and that, in addition, they were told of the substance of the restrictions.

They desired a high lot. The two they bought may be considered as one; they are situated at the northwest corner of Glenkirk and Queens Ferry Roads. One of these streets was paved at the time of the signing of the contract and the grading of the other had been established and was shown by stakes. At the time of the purchase, the lot was in the same condition as it was at the time settlement was called for, and in approximately the same condition it was when the suit was brought and as it is at the present time. The lots have a frontage on Glenkirk Road of approximately ninety feet. Along this entire frontage at the time of purchase and at the present time, the lot rises almost perpendicularly for a height of twelve or fifteen feet. There is a frontage of seventy-five feet on Queens Ferry Road. At the time of purchase and now, all of that frontage rises almost perpendicularly for a height of twelve or fifteen feet. There has been no change whatever in those two frontages since the day appellees bought the lot. The owners of lot number three, which adjoins the rear of appellees' lot on Queens Ferry Road, graded their lot so that a part of the rear of appellees' lot—the fifty feet northwest of Queens Ferry Road—is approximately the same height above the neighboring lot as the rest of the lot is above the street. It is this grading by the neighbors which the appellees now say entitles them to refuse to comply with their contract.

The only support for the allegation is this. Mrs. Crawford testified that when they looked at the lots, they liked them "because of their height and the height of the ground around them." She continued: "And we asked him if that ground would be disturbed and he said no, it would not, that those lots would remain on the level on which they showed then. * * * They were high on a hill, and we

asked if they would remain that way, and he said yes they would." Mr. Crawford's testimony on the subject was that he did not go through with the contract "Because of the changing of the contour of the land adjoining our lots and the type homes that were built in there after we signed the contract."

If misrepresentation is to serve as a basis for refusal of specific performance, and for rescission, it must not only be false and material but must have worked an actual injury to the complaining party and he must have had a right to rely on the full belief of its truth, for otherwise, as is said in *Lucas v. Long,* 125 Md. 420, 429: "* * * it was his own folly or fault, and he cannot ask of the Court to relieve him from the consequences." Moreover, as is said in *Pomeroy's Specific Performance of Contracts,* Third Ed., Sec. 219, p. 552, where the representation is general or is essentially an expression of opinion or expectation, the person to whom it is made is not justified in relying upon it and assuming it to be true, but is bound to make inquiry and examination for himself so as to ascertain the truth. Again, if the one to whom the misrepresentation has been made "* * * is, at the time when it is made, either from knowledge acquired previously, or from information obtained at that very moment, fully aware of the truth, acquainted with the facts as they really are, he cannot claim to be misled, and cannot disaffirm or defeat the agreement on the ground that it was procured by means of the false statements." *Pomeroy,* opus cited, Sec. 223, p. 558; *Cityco Realty Co. of Baltimore v. Friedenwald,* 130 Md. 329, 335.

It seems clear to me that in this case the appellees were not misled by the so-called misrepresentations, that they had no reason to believe them, assuming them to have been made, and that, in fact, they did not rely upon them. It seems entirely obvious that the real reason for their failure to go through with their contract was that they wished to build a much larger, more expensive and more pretentious house than those in the Glendale development, and proceeded to do so in another development, so that they had no use for the lots they had bought.

Glendale consists of a series of hills and dales. It had to be obvious to any person of ordinary intelligence who visited the development that some grading would have to be done on every lot if it were to have access from the street and be built on. The appellees must have realized that they themselves would have to build a road from either Glenkirk Road or Queens Ferry Road, which would require substantial lowering of grade, and they must have realized that unless they intended to permit the frontage on the two streets to remain as cliffs, they would have to grade them to a slope which would have permitted growth of some form of ground covering. What was apparent in the case of their own lots was apparent also in the case of the adjoining lots.

The argument that the owner of the neighboring lot had built a house whose roof would be visible from the appellees' lot, seems entirely unconvincing. The roof of almost every house in the development is visible from neighboring houses because of the hilly terrain. Furthermore, the appellees had to observe, when they bought the lot, that the roofs of the houses to be built just across from them on the south side of Glenkirk Road and on the east side of Queens Ferry Road, would be always visible to them if no change whatever was made in the contour of the land, because all of those lots were far below the grade of appellees' lot, almost precipitously so.

When the appellees purchased the lots they drove through a part of the development on which houses were already built. There were some twelve or fifteen of them. They could tell from these houses the general nature of the development. Some had signs on them, indicating a price of approximately $20,000. They negotiated for their lots in part in the office of the appellant's agent Shaffenacker, in a house that had been built by the Preston Construction Company for speculation, which was for sale at $18,500, plus a ground rent. There were signs on other of the houses indicating that they were for sale— not by owners but by builders.

There seems to be absolutely no merit in the contention that the appellees could have been misled or were in doubt

as to the character of the development or the kind of houses that had been and presumably were to be erected.

All that has been said is on the assumption that the appellees' testimony is the only testimony in the case. Actually, Sheffenacker, the real estate man and agent of the appellant, testified without contradiction that he told the appellees that the Glendale Corporation would not itself do any grading, but if the individual lot owners wanted to grade, they could do so provided they submitted plans for the approval of the grading, as well as of the house to be built. The appellees admit that they were told of these restrictions as well as the fact that they read of them in the contract. It is impossible to tell from Mrs. Crawford's one sentence of testimony (which is the only thing close to showing the alleged misrepresentation) whether she is referring to the lots which they bought or to other lots. Read literally, her testimony indicates that all she was inquiring about was the site of her own lots and that she was interested in not having that height disturbed.

When the Crawfords came back from their vacation, shortly before settlement time, they became interested in a lot in another development, having decided that a house of the type and of cost desired by them would be out of place in Glendale. The real estate man in the new development went to see Sheffenacker to see if they could be released from their contract. There was no mention of deception or of changes of contour of land. Mr. Crawford testified that he had never written or telephoned Shaffenacker or the Glendale Corporation asking them to be relieved of his contract, but that he wrote a letter to Sheffenacker, the day before settlement was due, in which he said: "We have watched Glendale being developed and do not feel that the houses being built are of the type that we believed would be constructed. If we built the house for which we have plans, we feel that we would be 'over-building' the development, and it would be an unwise investment.

*"For the reasons stated above* we would appreciate it if you will refund the deposit made on this property."

(Emp. sup.) There is no word or hint in that letter that the appellees had been deceived—merely that they had been mistaken in a belief. The answer is the first place the alleged misrepresentations are brought up. This does not add conviction or even plausibility to the claims. *Cityco Realty Co. of Baltimore v. Friedenwald, supra,* at page 335 of 130 Md. When asked why he finally decided not to build a house in Glendale, Mr. Crawford testified: "Because we wanted to build a 30 to $35,000 home and we didn't feel it advisable to build it with the type of homes that were going up out there. If anything happened to me, my wife would be unable to get anything out of it due to the type of houses that were going up out there." The record leaves no doubt in my mind that the Crawfords considered it to be unwise as a business matter to build in Glendale and that was the real and, indeed, the only reason why they did not go ahead with their contract. It can be the only reason because the lots they bought are today in substantially the same condition as they were when they bought them. Undoubtedly, they made a bad bargain, from their point of view, but it was one they made with their eyes open without any misrepresentations, as I see it; certainly, none that was material or on which they had a right to rely.

It is undenied that the lots are now worth more than the price paid by the appellees. No hardship whatever would result from requiring them to take title.