Louis **FIREISON** and Bernadine
Fireison, Appellants,

v.

Luvie M. **PEARSON**, Appellee.

No. 84–157.

District of Columbia Court of Appeals.

Decided Jan. 22, 1987.

Michael Alan Olshonsky, with whom
Mary P. Nyiri, Washington, D.C., was on
brief, for appellants.

Kenneth J. Ingram, Washington, D.C.,
for appellee.

Before MACK, BELSON and
ROGERS, Associate Judges.

PER CURIAM:

Upon consideration of appellee's
petition for rehearing en banc, the division
*sua sponte* grants reconsideration. Having concluded that the rule of *Piper v.
Jenkins*, 207 Md. 308, 314, 113 A.2d 919,

922 (1955) (if "the means of knowledge are at hand, and the purchaser undertakes to make an examination of the land records, he cannot say that he was deceived and injured by misrepresentations of the vendor") is controlling even in the absence of actual notice to the purchaser's agent, *see Shappirio v. Goldberg*, 192 U.S. 232, 241, 24 S.Ct. 259, 261, 48 L.Ed. 419 (1904) (agent's knowledge, actual or implied, imputed to purchaser); *Ryan v. Brady*, 34 Md.App. 41, 54, 366 A.2d 745, 752 (1976), we recall the mandate, vacate our opinion of January 29, 1986, and affirm the judgment of the trial court.[1] Because the purchasers, the Fireisons, undertook the responsibility of searching the title and preparing the deed, vendor Pearson had a complete defense to the allegations of fraud. Therefore, the trial court did not err in dismissing the action after the purchasers presented their case pursuant to Super.Ct. Civ.R. 41(b).

## I

Appellants Louis and Bernadine Fireison brought action against appellee Luvie M. Pearson for fraud and breach of contract. The trial court, sitting without a jury, granted a defense motion to dismiss the case at the close of plaintiffs' case. We will set forth the evidence as developed in plaintiffs' case.

Louis Fireison had become aware in March of 1975 that the Merry-Go-Round farm in Montgomery County, Maryland, owned by Mrs. Drew (Luvie) Pearson, was for sale. He set up an appointment with Tyler Abell, Pearson's agent and the developer of the tract, to inspect the property. Abell provided him with a plat of the farm, which showed a division of the property into 17 lots. The plat, which is dated June 1975, listed the area of Lot no. 6 as 5.1 acres. Abell showed Fireison the approximate boundary lines of all of the lots on the farm. The beginning and end of each lot were marked with steel stakes. Fireison understood that these stakes had been laid out by a surveyor. Fireison became interested in lot 6, partly because of a row of tall, old trees that lined one side of the property. The boundary line between lots 5 and 6, according to Abell, began on the other side of the trees. Abell confirmed that the approximate area of lot 6 was 5.1 acres and, according to Fireison, led him to believe that the June 1975, plat that he had

---

1. The dissent questions the propriety of the action of this division in granting rehearing and recalling the mandate. Part XI (A) of the Internal Operating Procedures of the District of Columbia Court of Appeals provides:

> The filing of a petition for rehearing en banc does not take the case out of the plenary control of the division deciding the case. The division may, on its own, grant rehearing and may do so without action by the full court.

A majority of the division deciding the instant case agreed, pursuant to I.O.P. XI(A), to grant rehearing *sua sponte*. The parties were afforded the opportunity to brief the issues surrounding the recall of the mandate as well as, again, the substantive issues; both parties did so.

This litigation has not yet come to an end in this court. Appellants' petition for rehearing en banc is being denied concurrently with the entry of this opinion. Therefore, we deem inapposite those authorities cited in today's dissent that hold that good cause must exist for reviving a case that has been fully and finally adjudicated in an appellate court. In the federal courts, any petition for rehearing, by the panel or by the court en banc, stays the mandate. FED.R.APP. P.

41. Our rules, to the contrary, provide for the stay of the mandate only upon the timely filing of a petition for rehearing by the division. The pendency of a petition for rehearing en banc, of itself, does not stay the mandate. D.C.App.R. 41. Our complementary internal operating procedures, quoted above, however, give the division the authority to grant rehearing whenever a petition for rehearing en banc is filed. The power to recall the mandate inheres in the power to grant rehearing.

Appellants have been afforded due process. The parties have been aware that a petition for rehearing en banc has been pending before this court. In addition, they submitted legal memoranda on the mandate issue and the substantive issue. The fact that this litigation remained before this court under our rules and internal operating procedures renders the case amenable to action by the division.

The dissent three times mentions that a year has gone by since the original ruling of the court. In that regard, it should suffice to say that the majority determined that it should affirm well before a year had passed.

showed him had already been recorded in the Montgomery County land records.

Pearson, the owner of the property, offered Fireison a five-year option to buy lot 6, and Fireison, an attorney, drafted on option contract that the parties signed in October of 1975. Paragraph 13 of the contract provided that "Vendor agrees to deliver the subject property in its recorded size consisting of approximately 5.1 acres." Other sections of the contract provided that copies of any surveys or plats of the property that might be ordered by the owner would be delivered to Fireison in advance of settlement (para. 5); and that an exact topographical survey would be made by the owner and a copy furnished Fireison (para. 7). The June 1975 plat that Fireison understood had been recorded was attached to the option contract. This plat had never been recorded.

Prior to exercising the option, Fireison visited the property on numerous occasions, and never observed any change in the stakes that marked out the boundaries of lot 6. In April of 1976, unbeknownst to Fireison, however, Abell changed the boundaries of lot 6. Lot 5 had remained unsold, so Abell sliced off the part of lot 6 that included the trees and appended it to lot 5 to make it more marketable. In addition, he cut off part of the back of lot 6 so that he would be able to create two lots behind lot 6 instead of an existing one. Lot 6 in its pared down form was 4.5964 acres. Abell must have had a survey prepared of the new boundaries of the lot,[2] for on November 6, 1978, he recorded a new plat in the Montgomery County land records, showing the area of lot 6 as 4.5964 acres. No copy of the plat or of the survey was furnished to Fireison, however, as the option contract required; indeed, no notice at all was given to Fireison that the June 1975 plat, which he thought was recorded, had been superseded, and that the acreage and

boundaries of the property subject to the option had been changed significantly.

On December 15, 1978, five weeks after Abell had the new plat recorded, the parties proceeded to settlement on the property. At settlement, the owner gave Fireison no indication of the change in the acreage and boundary lines of his property; neither a new survey nor the new plat was provided him. The option contract, however, had provided that the property would "be conveyed as designated by Vendees and Vendees hereby authorize the examination of the title and preparation of all necessary conveyance papers." Fireison had assumed the burden of searching the title of the property, and he entrusted this duty to an attorney, who also prepared a deed. The deed affected the conveyance of: "the following described land and premises ... namely: Lot numbered Six (6) in the Subdivision known as 'MERRY–GO–ROUND FARM,' as per plat recorded in Plat Book 106 at Plat No. 12150 among the Land Records of Montgomery County, Maryland." The designated plat, recorded by Pearson on November 6, 1978, on its face clearly states the area of lot 6 as 4.5964 acres. According to Fireison, the lawyer searched the title only for outstanding liens, and found none. The deed included no physical description of the lot, but referred to the plat book and number.

After taking possession of the property, Fireison received a county property tax bill, in 1979, that he thought seemed too low. He contacted the tax assessor's office and was informed that the acreage of his lot was only 4.5964 acres. He called Abell, who related how he had reshaped the lot to make other lots attractive, as described above, and then told Fireison "just ... to forget about it. He said I wasn't using the land anyway and it was nothing extra out of my pocket, just told me to forget about it." Since the trial judge dismissed the action at the close of plaintiffs' case, the

**2.** *See* 2 MONTGOMERY COUNTY CODE § 50–10 (1984) (surveyor's certificate must accompany record-    ed plat).

defense never presented its evidence. This appeal followed.

## II

The trial court issued findings of fact and conclusions of law following the close of plaintiff's case, dismissing the action under Super.Ct.Civ.R. 41(b). Under that rule, the court may dismiss an action if "upon the facts and the law the plaintiff has shown no right to relief." *Carrigan v. Purkhiser,* 466 A.2d 1243, 1245 (D.C.1983). Judgment for a defendant under Rule 41(b) is justifiable if "there is insufficient credible evidence to sustain each element of plaintiff's claim, or if, despite such credible evidence, a valid defense is evident from plaintiff's own case." *Marshall v. District of Columbia,* 391 A.2d 1374, 1379 (D.C. 1978). In an appropriate case, dismissal under Rule 41(b) will serve to avoid the unnecessary presentation of a defense case where it is already apparent to the trial judge that the plaintiff cannot prevail.[3] We have recognized, on the other hand, that a dismissal under Rule 41(b) is a "drastic remedy, to be sparingly exercised." *Bay General Industries, Inc. v. Johnson,* 418 A.2d 1050, 1054–55 (D.C. 1980). "[S]ound procedure in most cases requires withholding adjudication on the merits until both sides have presented their evidence." *Warner Corp. v. Magazine Realty Co.,* 255 A.2d 479, 481 (D.C.1969); *Darden v. Capitol Cab Cooperative Association,* 154 A.2d 352, 354 (D.C.1959).

The trial court based its dismissal on two alternative grounds. It concluded, first, that the Fireisons had not set forth a prima facie case of fraud. The court found that "[w]hile the defendant should have pointed out that the defendant re-drew the lot lines for their own advantage, they engaged in

no direct deceit." *Memorandum Opinion and Order* at 2. The court also found that even if plaintiffs had established all of the elements of fraud, their own case demonstrated that the defendant had a valid estoppel defense to the action. The court noted that since the new plat showing lot 6 to be 4.5964 acres had been recorded prior to settlement, the Fireisons's settlement attorney, who was responsible for a title search, was "charged with notice of all that appears in the properly recorded chain of title." This notice is imputable to the Fireisons. By accepting the burden of the title search, the court held, the Fireisons had also accepted the "risk of failing to do so," *i.e.,* the risk of failing to uncover that the boundaries and size of the lot had been changed without notice to them.

The court also decided that since the option contract stated that the vendor agreed to provide the property in its "recorded size consisting of approximately 5.1 acres," that the Fireisons had "freely contracted" to accept the property in whatever size it had been recorded. The court also found that "the plaintiffs proceeded to settlement in spite of the defendant's nonperformance [of the agreement to send copies of any new surveys and plats], thus waiving the right to receive the survey from the defendant prior to settlement." The court impliedly found that since the Fireisons had undertaken the search of the title the plat book and number listed in the deed were sufficient notice to them that the boundaries and acreage of this property had been changed; that their proceeding to settlement on this deed worked an implied acceptance of the new, restricted boundaries of the property; and that their prior dealings with Abell merged into the deed, pre-

---

3. In *Marshall v. District of Columbia, supra,* 391 A.2d at 1379 we said:

> [W]hen a defendant makes a Rule 41(b) motion in a nonjury trial, the court, as trier of fact, need not view the evidence in the light most favorable to the plaintiff. The court, rather "weighs the evidence and considers credibility the same as it would at the end of

the trial." *Warner Corporation v. Magazine Realty Co.,* D.C.App. 255 A.2d 479, 481 (1969). *See Ellis v. Carter,* 328 F.2d 573 (9th Cir.1964). The court, therefore, need not consider plaintiff's evidence as true, and if it finds that the evidence does not preponderate in plaintiff's favor, the court can enter judgment for the defendant.

venting them from now raising any challenges to the sale.

### III

■ Under Maryland law, the purchaser of property is required neither to examine the land records, nor survey the land, in order to determine the correct acreage. *See Piper v. Jenkins, supra*, 207 Md. at 312, 113 A.2d at 921. The purchaser clearly has a right to rely on the vendor's representations as to the boundaries and acreage of the land. *Id.* Even when the means of ascertaining the falsity of the vendor's representations are known and accessible, the purchaser's failure to review the land records will not bar his recovery. *See Chesapeake Homes, Inc. v. McGrath*, 249 Md. 480, 240 A.2d 245, 248–49 (1968).

If, however, "the means of knowledge are at hand, *and the purchaser undertakes to make an examination of the land records*, he cannot say that he was deceived and injured by misrepresentations of the vendor." *Piper v. Jenkins, supra*, 113 A.2d at 922 (emphasis added); *accord Ryan v. Brady*, 34 Md.App. 41, 56, 366 A.2d 745, 753 (1976); *see also Boring v. Jungers*, 222 Md. 458, 462, 464, 160 A.2d 780, 783–84 (1960) (sale may not be rescinded even if founded on misrepresentations of vendor when purchaser knew facts; knowledge of agent imputable to purchaser); *Glendale Corp. v. Crawford*, 207 Md. 148, 154, 114 A.2d 33, 36 (1955) (purchaser has right to rely on vendor's representation "in the absence of any knowledge of his own"); *Gunby v. Sluter*, 44 Md. 237, 249 (1876) (purchaser may not rescind sale, even though founded on misrepresentations, if prior to sale purchaser acquainted with facts). Thus, the crucial question is whether Fireison—by himself or through his agent—undertook an examination of the land records.

The controlling question just identified is not restricted to cases of negligent or innocent misrepresentation. Rather, the Court of Appeals for Maryland enunciated the "undertaking" principle in *Piper v. Jen-*kins*, a case in which the purchaser alleged that the vendor had made a fraudulent misrepresentation. 207 Md. at 312, 113 A.2d at 921. Moreover, in *Ryan v. Brady*, the Court of Special Appeals of Maryland reiterated the principle of *Piper v. Jenkins*, that "once the purchaser assumes the burden of an examination he cannot say that he was deceived to his injury where such examination discloses the correct information." *Ryan v. Brady, supra*, 34 Md.App. at 55, 366 A.2d at 753. Most important, both *Piper v. Jenkins* and *Ryan v. Brady* adopted that principle from the Supreme Court opinion in *Shappirio v. Goldberg*, 192 U.S. 232, 24 S.Ct. 259, 48 L.Ed. 419 (1904). *Shappirio* involved a claim of fraud, and the principle it enunciates is dispositive of the instant case.

In *Shappirio*, the purchaser alleged that the vendor falsely represented that the property adjacent to the purchased lot was included in the sale. 192 U.S. at 234, 24 S.Ct. at 260. A correct description of the property was, however, given in the deed and in the recorded chain of title. *Id.* at 241, 24 S.Ct. at 261. As in this case, the agent of the purchaser was entrusted with the examination of the deed and title. The Court explained that the agent was charged with the knowledge of the extent of the property conveyed since he undertook an examination of the deed and records. *Id.* The Court observed that a casual reading of the deed or recorded plat would have revealed the dimensions of the property. *Id.* The agent's knowledge, actual or implied, was imputed to the purchaser. *Id.* The Court stated:

There are cases where misrepresentations are made which deceive the purchaser, in which it is no defense to say that had the plaintiff declined to believe the representations and investigated for himself he would not have been deceived. But such cases are to be distinguished from the one under consideration. When the means of knowledge are open and at hand or furnished to the purchaser or his agent and no effort is made to prevent

the party from using them, and *especially where the purchaser undertakes examination for himself,* he will not be heard to say that he has been deceived to his injury by the misrepresentations of the vendor.

*Id.* at 241–42, 24 S.Ct. at 261 (emphasis added) (citation omitted). Here, too, a reading of the recorded plat would have revealed at once that plat 6 measured 4.6 acres. The vendors here did not prevent that reading, nor did they suggest the wording of the deed; rather the Fireisons' attorney undertook to describe the conveyance of property by referring to the recorded plat. Once the attorney undertook such an examination, she and her principals were charged with the knowledge imparted by the land records.

*Chesapeake Homes, Inc. v. McGrath,* 249 Md. 480, 240 A.2d 245 (1968), is not to the contrary. There is no indication in that opinion that the purchaser there undertook a title search or preparation of the deed. Certainly, the decision does not suggest a rejection of the *Shappirio* doctrine. The vendors in *Chesapeake Homes* did not assert that the purchaser undertook a title examination or deed preparation as in *Shappirio,* but contended that the purchaser could not seek relief from the deed when he *failed* to look at the referenced plat that he knew was posted at the vendor's office and filed at the land records office. 249 Md. at 489, 240 A.2d at 250. In holding in *Chesapeake Homes* that the vendor could not assert the failure of the purchaser to inform him or herself of land records when effort was made to prevent the purchaser from using them, the Maryland Court of Appeals ruled in a manner consistent with Maryland law and with *Shappirio,* 192 U.S. at 241, 24 S.Ct. at 261. Therefore, the holding of *Chesapeake Homes* does not assist appellants here.

■ In the present case, however, not only did the Fireisons' attorney undertake to examine the land records for a title search, she undertook to describe the parcel to be conveyed by the deed. Because, as she drafted it, the deed conveyed the lot as "per plat recorded in Plat Book 106 at Plat No. 12150 among the Land Records of Montgomery County, Maryland," it stretches credulity to suggest that she did not look at that plat.[4] At the least, it was not clearly erroneous for the trial court to infer that she did. *See Marshall v. District of Columbia, supra,* 391 A.2d at 1379–80 (appellate court, pursuant to Super.Ct.Civ.R. 41(b) & 52(a), will not set aside trial court findings, unless they are clearly erroneous, with due regard to trial court's opportunity to judge credibility).

Furthermore, even if the Fireisons' lawyer did not actually look at the record plat, she was chargeable with notice once she undertook a title examination and preparation of the deed. *See Shappirio v. Goldberg,* 192 U.S. at 241–42, 24 S.Ct. at 261. Again, appellants suggest a distinction in *Ryan v. Brady* that the Maryland court itself did not hold dispositive. The purchaser's lawyer there at first could not recall whether he actually viewed the plat. He thereafter admitted, however, that he saw it. 34 Md.App. at 54, 366 A.2d at 752. The court stated that either the actual *or* implied notice of the lawyer would be imputed to his client: "a title examiner is charged with notice of whatever appears in the land records in the chain of title to the property involved.... [N]otice to an attorney is notice to his client." *Id.* (citations omitted); *see Williams v. Skyline Development Corp.,* 265 Md. 130, 164, 288 A.2d 333, 353 (1972).

Therefore, even if, *arguendo,* we assume a fraudulent misrepresentation on the part of the vendor, the undertaking by the Firei-

---

**4.** In *Ryan v. Brady, supra,* 34 Md.App. at 53, 366 A.2d at 752, purchaser's attorney, who searched title, acknowledged that it was obvious that he saw the recorded plat before drafting the deed and other papers. The trial judge in that case had stated: "[T]he Court cannot conceive of a conscientious title attorney ... engaged in a transaction of this size and character [sale of house and lot for $240,000], failing to read the recorded plat of subject property preparatory to drawing the contract of sale and deed and guaranteeing the title...." *Id.* at 754.

sons through their attorney to examine the title and describe the property in the deed defeats their claim that they were deceived to their injury. The trial court's judgment, therefore, should be affirmed.

Finally, we are aware that as the record stood at the close of plaintiffs' case, there was substantial evidence of misleading conduct on the part of defendant's agent. That evidence might or might not have been overcome by defendant's evidence. But the trial judge was not obliged to hear the defendant's case because plaintiffs' case-in-chief had demonstrated that defendant was entitled to judgment. As we discussed above, Super.Ct.Civ.R. 41(b) authorizes a trial judge, sitting without a jury, to weigh the evidence and consider credibility when a defendant moves to dismiss at the close of the plaintiff's case. We are satisfied that the trial judge did not err in dismissing appellants' suit.

Accordingly, the mandate is hereby recalled, our opinion of January 29, 1986, is vacated, and the judgment is affirmed.

*So ordered.*

MACK, Associate Judge, dissenting:

I view the recall of the mandate by this division, sua sponte, as amounting to the raw exercise of power, and incompatible with the orderly administration of justice. Presumably the majority in doing so is not without qualms, since it deems it necessary to preface its opinion with the notation that Luvie Pearson (the losing party in our prior decision issued January 29, 1986) had filed a petition for rehearing en banc. I suggest that this reference to an unsuccessful en banc petition is of no legal significance whatever under the circumstances here.

We have already decided this case. *Fireison v. Pearson,* 503 A.2d 1271 (D.C.1986) (*Fireison I*). We did so after full briefing, after full argument, and after full deliberation. In *Fireison I,* a majority of this division reversed the trial court's dismissal of the underlying action during trial and, as a result, the trial court set a new trial upon the merits to begin at 9:30 a.m. on June 24, 1987. Preparations for the new trial were taken in full compliance with our mandate reinstating the action for that purpose; the mandate issued to the trial court on March 6, 1986.

"Issuance of the mandate formally marks the end of appellate jurisdiction." *Johnson v. Bechtel Associates Professional Corp.,* D.C., 255 U.S.App.D.C. 198, 201, 801 F.2d 412, 415 (1986) (per curiam). Our rules provide that the mandate of this court shall issue twenty-one days after the entry of judgment. D.C.App.R. 41(a). A mandate is stayed by the timely filing of a petition for rehearing before the division. *Id.* But Pearson never filed such a petition. Although she did file a petition for rehearing en banc, the mandate is not stayed by an en banc petition, so that here the mandate duly issued during that petition's pendency before the full court. *Id.* The real question in this case, therefore, one which the present majority utterly fails to confront, concerns the circumstances in which our mandate may be recalled.

In its footnote 1, *ante* at 1047, the majority makes its one passing reference to its recall of the mandate, the propriety of which action is now the sole issue in this already-decided case. The majority impliedly recognizes the complete absence of supporting authority for its disruptive action when it invokes, out of context, an internal operating procedure which on its face makes no reference to recall of a mandate.[1] By its

---

1. The majority introduces the language of the procedure with editorial opening and closing comments referring to recall. Specifically, the procedural language relied upon provides that "[t]he filing of a petition for rehearing en banc does not take the case *out of* the plenary control of the division deciding the case. The division may, on its own, grant rehearing and may do so without action by the full court." D.C.App.

I.O.P. XI A (emphasis added). The provision that the filing of an en banc petition does not take the case "out of" the division's plenary control is patently irrelevant to cases—where the mandate has issued—which are not "in" the plenary control of the division in the first place.

The obvious purpose of I.O.P. XI A is one of fostering judicial economy by allowing the de-

very terms, the procedure relied upon by the majority is intended to give guidance only in cases—unlike this one—which remain in the "plenary control" of the deciding division.[2]

This case has not been in the plenary control of the division since our mandate issued on March 6, 1986. On that date "[j]urisdiction return[ed] to the tribunal to which the mandate [was] directed, for such proceedings as may be appropriate...." *Johnson v. Bechtel Associates Professional Corp., D.C., supra,* 255 U.S.App.D.C. at 201, 801 F.2d at 415; *see also United States v. DiLapi,* 651 F.2d 140, 144 (2d Cir.1981), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982). After issuance of our mandate, the trial court was not only free to exercise its renewed jurisdiction, but was under a duty to do so by holding a new trial on the complaint it had erroneously dismissed. *Id.* Thus, at no time since issuance of the mandate has this division had "full, entire, complete, absolute, perfect, unqualified" control of this case. The filing of a petition for rehearing en banc did not vest plenary jurisdiction in this division absent an otherwise proper recall of the mandate. *See United States v. DiLapi, supra,* 651 F.2d at 144. As our appellate rules make plain, "[t]he pendency of a petition for rehearing en banc [on its own] shall *not* affect the finality of the judgment of the court or stay the issuance of the mandate." D.C.App.R. 41(a) (emphasis added). Because plenary control has been, and still is, vested in the trial court, this division cannot rely on isolated language from our internal operating procedures to recall the mandate in violation of settled legal principles and the rules of this court.

The controlling legal principles are rather the well established standards governing recall of a mandate that has already issued. One instance in which a mandate may be recalled is when the en banc court *grants* a petition for rehearing en banc. *See Towles v. United States,* 497 A.2d 793 (D.C.), *granting en banc reh'g, recalling mandate, and vacating en banc mem.,* 496 A.2d 560, *argued en banc Mar. 19, 1986, petition for cert of division decision dismissed,* — U.S. —, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Action by the full court in such circumstances is the functional equivalent of an order from a higher court and is not to be compared to the action of a division. In this case, the en banc court has not seen fit to grant Pearson's petition for en banc rehearing. It has refused to do so because en banc rehearing is not favored and ordinarily will not be ordered unless (1) consideration by the full court is necessary to secure or maintain uniformity of its decisions, or (2) the proceeding involves a question of "exceptional importance." D.C.App.R. 40(e). Here, neither of these conditions is met.

Instead, it is a majority of this division which today, sua sponte, recalls the mandate. A motion for recall of the mandate is appropriately addressed to the deciding division in the first instance. *Derrington v. United States,* 509 A.2d 605, 605–06 (D.C. 1986) (per curiam). No motion for recall of the mandate was directed to this division. Even if a motion for recall of the mandate were properly before us, the action now taken by the division would be no less

<hr>

ciding division to reconsider its position before the mandate has issued, thus making consideration of the en banc petition unnecessary. D.C. App.R. 40(e), 41(a). In this case, the full court, with knowledge that the mandate has issued, has refused to grant en banc rehearing (and thus refused to recall the mandate) and the division's persistence in seeking to act without authority has actually defeated the purpose of judicial economy.

I.O.P. XI A is not intended to give this division a license to sua sponte recall its mandate and change its disposition, here effective a year after the decision, without any regard to the limited circumstances in which recall is appropriate.

The majority's construction of I.O.P. XI A puts that procedure in direct conflict with D.C. App.R. 41(a).

**2.** "Plenary" means "complete in every respect: ABSOLUTE, PERFECT, UNQUALIFIED...." Webster's Third New International Dictionary 1739 (1971). It has also been defined as "[f]ull, entire, complete, absolute, perfect, unqualified." Black's Law Dictionary 1038 (5th ed. 1979).

troubling. The problem here is more than procedural.

Appellate courts have inherent power to recall a mandate upon a showing of *"good cause,"* but that power should be exercised sparingly. *American Iron & Steel Institute v. EPA,* 560 F.2d 589, 592–95, 44 A.L.R. Fed. 813, 818–21 (3d Cir.1977), *cert. denied,* 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978); *Greater Boston Television Corp. v. FCC,* 149 U.S.App.D.C. 322, 331, 463 F.2d 268, 277 (1971), *cert. denied,* 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972). Recall of the mandate must be necessary to avoid injustice and it is proper only in the presence of "exceptional circumstances." *American Iron & Steel Institute v. EPA, supra,* 560 F.2d at 599, 44 A.L.R. Fed. at 829; *Greater Boston Television Corp. v. FCC, supra,* 149 U.S.App. D.C. at 332, 463 F.2d at 278; *see also Watson v. United States,* 508 A.2d 75, 81, *en banc reh'g granted and vacated en banc mem.,* 514 A.2d 800, *argued en banc Nov. 6, 1986* (D.C.1986); *Bell v. Westinghouse Electric Corp.,* 507 A.2d 548, 549 (D.C.1986); *Streater v. United States,* 478 A.2d 1055, 1057 n.3 (D.C. 1984). The present division majority recalls the mandate with barely a nod to the "good cause" requirement. That requirement is not openly acknowledged because it cannot be met. There has been no showing of "good cause" here.

Specific instances of "good cause" shown, which justify an appellate court in recalling its mandate, are: (1) the correction of clerical mistakes and clarification of mandate and opinion; (2) fraud on the court or other misconduct affecting the integrity of the judicial process; (3) the avoidance of differences in results to cases pending at the same time; (4) the need to revise an unintended instruction to the trial court that produces an unjust result; and (5) other grounds of injustice which render it "manifestly unconscionable" that a judgment be given effect. *Greater Boston Television Corp. v. FCC, supra,* 149 U.S. App.D.C. at 331–33, 463 F.2d at 278–80 (and cases cited therein). Not one of these "exceptional circumstances" can be invoked in this case.[3]

One division judge dissented from our original decision in this case. *Fireison I, supra,* 503 A.2d at 1277–80. A new division majority now reinstates the trial court's dismissal of the Fireisons' complaint because another division judge (a member of the original majority) after much further reflection has concluded (I think mistakenly) that the holding of a case relied upon in the original dissent controls. This is not "good cause" justifying recall of a mandate.

The "good cause" standard is a high one. Our power to recall mandates "is not to be availed of freely as a basis for granting rehearings out of time for the purpose of changing decisions *even assuming the court becomes doubtful of the wisdom of the decision that has been entered and become final."* *Greater Boston Television Corp. v. FCC, supra,* 149 U.S.App. D.C. at 331–32, 463 F.2d at 277–78 (emphasis added) (citing *Estate of Iverson v. Commissioner,* 257 F.2d 408, 409 (8th Cir.) (per curiam), *cert. denied,* 358 U.S. 893, 79 S.Ct. 154, 3 L.Ed.2d 120 (1958)). Recall is not a vehicle for correcting alleged errors of law: "Certainly, an alleged failure to correctly construe and apply the applicable state law does not constitute 'good cause'...." *Hines v. Royal Indemnity Co.,* 253 F.2d 111, 114 (6th Cir.1958); *see generally* 16 C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice and Procedure § 3938 (1977).[4]

---

**3.** Indeed the full court has implicitly recognized, by refusing to grant Pearson's petition for en banc rehearing, that the underlying merits do not involve "exceptional" circumstances. D.C.App.R. 40(e). Today's recall of the mandate by the present division majority, of course, introduces into this case an issue not considered by the en banc court in denying Pearson's petition.

**4.** The case which is the focal point of such agony of decision is *Shappirio v. Goldberg,* 192 U.S. 232, 24 S.Ct. 259, 48 L.Ed. 419 (1904), a

Underlying the "good cause" requisite for recall of the mandate is the showing of a need to avoid injustice. The relief of injustice is the consideration which can override the deep-rooted policy in favor of the repose of judgments and the interest of finality. *Greater Boston Television Corp. v. FCC, supra,* 149 U.S.App.D.C. at 331–33, 463 F.2d at 277–79. What the court is doing today is creating injustice, not relieving it. It is recalling the mandate, vacating a published opinion, and changing its disposition a year after the decision was published and almost eleven months after the mandate has issued. It is doing so despite the fact that our original opinion did noth-

ing more than give purchasers of land, who complained of and presented proof of fraud on the part of the seller, the right to a trial on their complaint. This belated change of thinking in effect gives the defendant—whose agent has admittedly engaged in misleading conduct—a valid defense of contributory negligence against the purchasers she defrauded. It defeats the legitimate expectations of litigants who have relied upon a final decision in their favor. The division majority's recall of the mandate in this fact-specific case—under the guise of complying with an octogenarian decision whose holding is in any event open to dispute—is unprecedented.[5]

case, like this one, involving a dispute between a seller and a purchaser of land.

In the first place, I note that *Shappirio* is of persuasive value only, as it was an interpretation of District of Columbia law whereas *Fireison I* involved an interpretation of Maryland law. Although *Shappirio* was decided by the United States Supreme Court in its then capacity as the highest court of the District of Columbia, it is axiomatic that the Maryland Court of Appeals, and not the Supreme Court, is the final arbiter of the law of that state. *E.g., Meredith v. City of Winter Haven,* 320 U.S. 228, 234, 64 S.Ct. 7, 10, 88 L.Ed. 9 (1943); *Am. Radiator & Standard Sanitary Corp. v. Mark Eng'g Co.,* 230 Md. 584, 588, 187 A.2d 864, 866 (1963).

Moreover, the precise holding of the *Shappirio* Court is subject to dispute. In my view, *Shappirio* is factually distinguishable from the instant case. In *Shappirio* fraud (by silence) was alleged against the seller but not proved; in this case "misrepresentations [were] made which deceived the purchaser in which it is *no defense* to say that had the plaintiff declined to believe the representations and investigated for himself he would not have been deceived." *Shappirio v. Goldberg, supra,* 192 U.S. at 241, 24 S.Ct. at 261 (emphasis added). I note also that in *Shappirio* the true size of the lot conveyed was apparent to the purchasers from a complete description on the face of the deed, *id.* at 241, 24 S.Ct. at 261; see majority opinion, *ante* at 1050, whereas here, because "[t]he deed included no physical description of the lot, but referred to the plat book and number," majority opinion, *ante* at 1048, the discrepancy between the contract and the conveyance could be discovered only by reference to extrinsic sources.

It is clear that one can reach different interpretations depending upon which phrases one underlines in *Shappirio.* It is likewise clear that the analysis employed by the majority today compels the ridiculous result that contributory negligence is a defense to fraud. It is clearer

still that changing, but still conflicting, interpretations of *Shappirio* do not involve "exceptional circumstances" justifying recall of the mandate.

5. I do not use the word "unprecedented" merely for its rhetorical impact. A WESTLAW search for the word "recall" (and its derivatives) in the same sentence as "mandate" reveals not a single case that supports the action taken by the division majority today. (RECALL! /s MANDATE, databases DC–CS, CTADC, and CTADC–OLD, WESTLAW search dated Jan. 13, 1987.) The search was conducted in the binding caselaw of this jurisdiction, which includes all decisions of this court, together with those of the United States Court of Appeals for the District of Columbia Circuit rendered prior to February 1, 1971. *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971).

This court refused to recall its mandate in three of the six cases in which the issue has arisen. *Derrington v. United States, supra,* 509 A.2d at 605–06; *Watson v. United States, supra,* 508 A.2d at 79–81, 88, 91; *McKeamer v. United States,* 458 A.2d 737, 738 (D.C.1983) (en banc mem.) (Nebeker, J., separate statement). In another, the full court recalled the mandate within six weeks after issuance when it sua sponte called for rehearing en banc. *Towles v. United States, supra,* 497 A.2d 793. In a second case, we recalled the mandate in order to reopen the direct appeal of a criminal defendant who claimed that appellate counsel in his original appeal had provided ineffective assistance, a claim which by its very nature called for such an approach. *Streater v. United States, supra,* 478 A.2d at 1057. In the one remaining case, we recalled our mandate in light of a claim that it would produce "harmful effects 'on the administration of justice in this jurisdiction,'" it being also apparent from the motion to recall the mandate that the government had "misinterpreted" our earlier decision. *Epperson v. United States,* 495 A.2d 1170, 1171–73 (D.C.1985). It is

Finally, I suggest that today's action by the majority is in conflict, not only with our caselaw and our rules, but also with the Constitution. The Fifth Amendment provides that "No person shall ... be deprived of life, liberty, or property, without due process of law...." It is unquestionable that the issuance of our mandate in *Fireison I,* favorable to the appellants and directly affecting the outcome of their suit for damages arising out of a contract to purchase land, implicates a property interest. I cannot believe that due process permits a division of this court to sua sponte deprive successful litigants of their property interest in a final decision without any showing of "good cause," the manner in which the mandate is recalled here.[6] If the division majority can recall the mandate in

this case, there is not a case in the books that can rest in peace.

Litigants are aware of their rights to request reconsideration and recall of the mandate, or to petition an en banc or a higher court for further review. At some point, however, the winner is entitled to expect, and the loser must accept, that their controversy will reach a state of repose in order that they may get on with their lives.[7] It is not asking too much of judicial responsibility that it take on the task of making definitive decisions. It would be bad enough if the new majority's uninvited reentry into the decisionmaking arena only cluttered up the law reports. But, much worse, in working an injustice upon successful litigants, today we invite a

significant that the search reveals not one civil case in which we recalled our mandate. (Due to limitations on the WESTLAW DC–CS database, the above search covers full text and headnotes back to 203 A.2d 37 (1965), only headnotes from then back to 121 A.2d 178 (1956), and no earlier cases. However, neither the DISTRICT OF COLUMBIA DIGEST (1958 & Supp.1986) nor the ATLANTIC DIGEST 2d (1982 & Supp.1986) reveals any prior case on this issue.)

The United States Court of Appeals for the District of Columbia Circuit refused to recall its mandate in four of the nine cases which came before it and its predecessors prior to February 1, 1971. *Pratt v. United States,* 70 App.D.C. 7, 10, 102 F.2d 275, 278 (1939); *Snyder v. Hunter,* 56 App.D.C. 164, 11 F.2d 336 (1926); *Faunce v. Woods,* 55 App.D.C. 330, 330, 5 F.2d 753, 753, 40 A.L.R. 208 (1925); *Ass'n of Survivors of Seventh Ga. Regiment v. Larner,* 55 App.D.C. 156, 156, 3 F.2d 201, 201 (1925). In three others, it recalled and reissued the mandate in order to clarify its true meaning. *Washington v. Clemmer,* 119 U.S.App.D.C. 216, 220, 339 F.2d 715, 719 (1964) (per curiam); *Freid v. McGrath,* 77 U.S.App.D.C. 385, 386, 135 F.2d 833, 834 (1943); *Prall v. Prall,* 56 App.D.C. 336, 336–37, 15 F.2d 735, 736 (1926) (per curiam). In another, it recalled and stayed the mandate immediately after issuance so as to allow the losing party to appeal to the United States Supreme Court. *Hoover v. Intercity Radio Co.,* 52 App.D.C. 339, 343, 286 Fed. 1003, 1007 (1923). In the one remaining case, the fact of immediate recall and stay of the mandate is noted but not explained, which suggests that it too was to facilitate an appeal to the Supreme Court. *Fred v. Dist. of Columbia,* 59 App.D.C. 79, 79, 33 F.2d 375, 375 (1929). (This search extends back to 258 Fed. (1919).)

All of the cases in which the mandate was recalled involved "exceptional circumstances." None involved a situation where a new majority of the division simply changed its mind, and subsequently brought about a change in the disposition of the case a year after the court's opinion was first published.

6. While on the due process issue, I note yet another problem with the present division majority's reliance on the legally irrelevant filing by Pearson of an unsuccessful petition for rehearing en banc. That petition was not filed, as our rules require, within the fourteen day period following entry of judgment in *Fireison I.* Pearson did successfully move this court—also after expiration of the fourteen day period following entry of the judgment—for an enlargement of time. Although our rules allow these requests to be granted "for good cause shown," D.C.App.R. 26(b), the Fireisons were never given an opportunity to contest whether such a showing had been made. Indeed they assert that they were unaware of Pearson's request for enlargement of time until after it was granted. The majority's reference, in its footnote 1, *ante* at 1047, to the pendency of an unsuccessful en banc petition and the briefing of the parties does precisely nothing to refute either of the due process claims presented here and in the text.

7. I recognize that special considerations exist with regard to criminal convictions because of their unusually grave consequences. This point is illustrated by our recent adoption of D.C. App.R. 41(c), which makes special provision in our rules for the recall of mandates in criminal cases.

legion of decided cases to arise from their graves and come back to haunt this court.

I respectfully dissent.

Before PRYOR, Chief Judge, and NEBEKER, MACK, NEWMAN, FERREN, BELSON, TERRY, ROGERS and STEADMAN, Associate Judges.

### ORDER

PER CURIAM.

On consideration of appellee's petition for rehearing en banc of our decision of January 29, 1986, 503 A.2d 1271, it is

ORDERED that the petition is denied.